## MONK GIBSON v. THE STATE.

### No. 3752.    Decided April 22, 1908.

**1.—Murder—Change of Venue—Jurisdiction.**

Where in a prosecution for murder the venue was changed by the action of the court on his own motion, the jurisdiction of the county to which the venue was changed could not be called in question, where it was shown that no exceptions were saved to the action of the court in the county from which the venue was changed; and no bill of exceptions containing the evidence was reserved.

**2.—Same—Compurgators—Affidavits.**

Where in a prosecution for murder the venue had been changed from the original county on motion of the court to another county of the same judicial district, in which last county the defendant filed his application for change of venue, supported by his own affidavit, but not by the assisting affidavit of two compurgators, the same is insufficient. Following Mitchell v. State, 43 Texas 512, and other cases.

**3.—Same—Jury and Jury Law—Talesman—Statutes Construed.**

Article 648, Code Criminal Procedure, provides that where there shall not be a sufficient number of jurors to make the number required for the special venire, the court shall order the sheriff to summons talesmen and this provision

of the Criminal Code is not abrogated by the Act of the Twenty-ninth Legislature which provides that no juryman drawn by the jury commissioners shall be required to serve or drawn on but one venire in a capital case.

**4.—Same—Circumstantial Evidence—Presumption of Innocence—Reasonable Doubt—Charge of Court.**

Where upon trial for murder, the evidence was circumstantial, and the court charged properly on such evidence: and on presumption of innocence, and on reasonable doubt, the court correctly refused special charges on these subjects which were argumentative and on the weight of testimony.

**5.—Same—Charge of Court—Confessions—Declarations by Defendant.**

Where upon trial for murder, there were no admissions or statements by the defendant admitting the killing, but declarations by him of collateral and incidental facts shown to be untrue, and offered in evidence by the State as tending to show that the account given by defendant was untrue, known by him to be untrue, and incriminating against him, showing an effort to shield himself, etc., there was no error in refusing a special charge that when confessions of defendant are admitted in evidence, the whole of such confessions must be taken together, and the State bound thereby, unless they are shown to be untrue. Following Pharr v. State, 7 Texas Crim. App., 472; and other cases.

**6.—Same—Charge of Court—Declarations of Co-defendant—Principal—Accomplice.**

Where the defendant was indicted with another as principal, as well as an accomplice and accessory after the fact in murder, and the declarations of his codefendant, who had previously been convicted as a principal, were in evidence, and the court charged that such declarations could only be considered whether said principal was guilty, etc., the court correctly refused a requested charge upon the same subject.

**7.—Same—Principal—Accessory—Declarations of Principal—Charge of Court.**

Where upon trial for murder, the defendant was charged as principal, accomplice and accessory after the fact, the court correctly admitted in evidence the declarations of one who had been previously convicted as principal in the murder, and in doing so instructed the jury that such declarations were admissible to show the guilt of the principal, but not that of the defendant as an accomplice or accessory; there being no suggestion in the record ·of· covinous intent or improperly admitting such declarations; besides there was no motion to require the State to elect, and therefore testimony tending to establish the guilt of the defendant under either of the counts was admissible under said instruction of the court. Following Simms v. State, 10 Texas Crim. App., 131.

**8.—Same—Postponement—Discretion of Court.**

Where upon trial for murder, defendant's attorneys asked for a postponement of trial, to prepare themselves for the defense, claiming to have been recently appointed by the court, etc., the same was addressed to the discretion of the trial court: and where the record did not show any injury to the defendant by the failure of the court to delay the trial, there was no error.

**9.—Same—Argument of Counsel—Bill of Exceptions.**

Where upon trial for murder defendant's counsel objected to the argument of State's counsel, that not to let it be said that a jury of the county could only hang a white man, and the bill of exceptions did not properly set forth the matter objected to, the same could not be considered on appeal. The same ruling applies to another remark of the district attorney in commenting upon the depraved nature of defendant; besides no request for instructions to disregard said argument appears to have been made.

**10.—Same—Evidence—Photographs.**

On trial for murder, there was no error to admit in evidence certain photographs showing the size and location of the house and its surroundings which showed the scene of the homicide, and which photographs were proved to correctly represent the scene of the murder and the location of said house; such testimony was admissible on the same theory that diagrams, plats and etc., are admissible in evidence.

**11.—Same—Race Discrimination.**

Where upon trial for murder the defendant objected to the additional venire and talesmen summoned by the sheriff under the order of the court, on the ground of race discrimination, but according to the court's explanation of defendant's bill of exceptions there was no evidence offered as to such discrimination, there was no error.

**12.—Same—Capital Offense—Nonage of the Defendant.**

Where upon trial for murder, there was some testimony tending to show that defendant was at the time of the commission of the offense under the age of seventeen years, but this testimony was contradicted by defendant's mother: and other testimony showed conclusively that the defendant was more than seventeen years of age at the time of the homicide, the issue became one of fact, and a verdict assessing the death penalty was warranted.

**13.—Same—Sufficiency of the Evidence.**

Where upon trial for murder the testimony, though circumstantial, established incontestably the guilt of the defendant, the conviction of murder in the first degree with the death penalty is sustained.

Appeal from the District Court of DeWitt. Tried below before the Hon. James C. Wilson.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Horace Wimberley* and *W. L. Atkinson* (by appointment of the court) for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.—Cited cases and authorities stated in opinion.

RAMSEY, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

For some two weeks prior to September 28, 1905, J. F. Conditt resided on a rented farm about two miles from the town of Edna in Jackson County. His family consisted of himself and his wife, Mrs. Lora Conditt, and the following children: Mildred, a girl about 12 years of age, and Herschell, Jessie, Joseph and Loyd, ages respectively 10, 6 and 3, the last named being an infant about 10 months old. On the 28th day of September, 1905, he left home very early in the morning, near four o'clock, to go about six miles where he was engaged in the rice business. On Monday before the homicide appellant, Monk Gibson, had been employed by Mr. Conditt to work on his place, and during most of that time was engaged in various kinds of farm work. Conditt lived close to a number of negro families, and about a mile from a white man named John Gibson. There were several negro families living near by, and his residence was close to a road not infrequently traveled, and was situated on the prairie, and was in open view of his neighbors, black and white, for quite a distance. About half past one or two o'clock the fact was discovered that his wife, and all of his children had been murdered except the infant babe, and when the neighbors

came to make a more particular observation, it was found that Mrs. Conditt had been killed by being struck on the head with a blunt instrument and her skull crushed. A bloody adz belonging to Conditt was found close by, and it was found that she had met her death by this instrument. The girl, little Mildred, had her throat cut, and when found was lying near the bed bathed in her blood, her body exposed, with visible and unquestionable evidences of having been outraged. The little boy, Joseph, was found just outside of the house on the ground with his throat cut and his head almost completely severed from his body. The other boys, Herschell and Jessie, were found some seventy-five yards from the house about thirty steps apart, one on the inside of the wire fence, and one just on the outside. Appellant was arrested on the evening of the homicide, and was confined in jail until the next day when, while being transferred to jail in Hallettsville, he made his escape and remained at large until October 9, 1905. There were no evidences in the room of any struggle by any of the parties; none of the furniture was turned over and no evidences of any disarrangement of the usual furniture and appointments of such a household, making it apparent that none of the persons killed had made or were able to make any considerable struggle. Nor was there, notwithstanding the immense quantities of blood about the floors, any evidence of any bloody tracks or footsteps on them. The boys in the field, it should be stated, were evidently killed with a bar of iron, which was found near the body of the oldest child. There are many circumstances which make it unlikely that all of these people could have been killed by any one person without making an outcry which could have been heard, and without disarrangement of the furniture, chairs, tables, mirrors, etc. It was shown that appellant alone knew of the location of the adz, and that he was perfectly familiar with the premises, location of the rooms, etc. It is not certain when the murder occurred, but there are some circumstances which tend to indicate that it must have happened near or before the middle of the forenoon. Early in the afternoon the first alarm was given by appellant, he stating to Augusta Diggs, to his own people, and to the witness, John Gibson, that somebody was at Mr. Conditt's house running Mrs. Conditt, or chasing her as some of the witnesses put it. On inquiry by some of them he stated that he was unable to say who it was, or whether they were negroes or white men. He stated, however, that there were two of them; that one of them was a good large man and the other not so large, and that both of them had a black mustache. It was shown by all the testimony that one standing on any portion of the plowed ground where he was at work, not only could have seen and ascertained whether persons about the house were negroes or white men, but could easily have recognized any one with whom they were at all familiar. So that it is manifest that if he saw these people, as he states, he must have known whether they were negroes or white men, and it is equally true that if he was acquainted with them at all, that he knew who they were. At another time appellant

stated that the persons at Mr. Conditt's house whom he saw running Mrs. Conditt, were two negroes named Al and Woodson Ware, but upon being informed of the fact that both of these negro men were at wholly a different place many miles from the scene of the tragedy, he admitted that he had made a false statement about the matter, and then claimed that while he knew these people, he was mistaken, and that one of the men whom he saw looked like Ed Powell, and the other a larger and blacker man. At another time he stated that Felix Powell was one of the men running Mrs. Conditt, and that while he was in the field Felix came to him and led him up and pushed him into blood of Mrs. Conditt and told him if he ever told it he would kill him. This he afterwards denied. He also stated that he was not in any room except the room that Mrs. Conditt was in. It is remarkable, however, that, notwithstanding, he claimed to have made only a momentary inspection of the bloody work of murder, that he was able to give a particular description of the position of all the bodies of the dead people at the house, and a like particular description of how they were injured. When first arrested there was blood on many portions of appellant's clothing, and on his body. There was, for instance, blood on his sleeve, and on the inside of the sleeve. On being interrogated as to how that blood got on his sleeve, he stated that he had got this blood on his clothing from a scratch on his wrist. An examination showed that while there had been a very slight scratch on his wrist, that it was not sufficiently extensive to account for this blood, and besides it was dry and there was no blood at all about it. His attention was then called to two or three splotches of blood on his shirt in front near the collar, and also some blood right down near the tail of his shirt, the front portion of which had been cut or torn off, and blood on the remaining portion of the tail of his shirt, and smears of blood on the inside next to his body. He accounted for this blood by the statement that his nose had bled. His nose was carefully examined, and it was found that his nose had not bled. There was no blood in or about his nose, and after same had been carefully and thoroughly examined there was nothing to indicate that same had bled at all recently. No explanation was given why or how the tail of his shirt had been torn off, but he undertook to account for the blood on the portion of his shirt-tail which remained by stating that same was caused from a small scratch he had on his penis which he had made by going through the barbwire fence, but a careful examination of this member disclosed no injury to or scratch on it. There was also blood on both of his feet, and on both of his legs, both on the inside and outside of both legs, but rather more on the right leg. One of the witnesses say there was a great quantity of blood on each leg running from the size of a match-head up to the size of a quarter. Blood was also found on his overalls. He undertook to account for the presence of this blood on his legs by saying he had gotten same on him by riding a sore-back horse, but when the pants, which he says he was wearing, were examined, especially near the seat, which presumably would

Vol. 53 Crim.—23.

come in contact with the back of the horse, there were no indications at all of any blood on them. In fact, it is doubtful if a single statement made by him of any kind touching his whereabouts and presence was corroborated by any other testimony, but it' was substantially all disproved, and many of his statements afterwards confessed by him to be untrue. No one seems to have seen him during the morning except about 10 o'clock when Felix Powell was seen in the field with him walking along by his side while appellant was engaged in plowing, and by other witnesses at a time hereafter named. The night the murder was discovered the peace officers of Jackson County obtained some bloodhounds from a convict camp near by and carried them to near where the dead bodies of the boys lay in the field. They soon struck a trail, and after going a short distance bayed loudly and it was found that close to the place where the dogs opened up on the trail there was found a track of a barefooted man. This track was measured and found to correspond very closely with the size of Gibson's foot, and it was shown that on the day in question he was barefooted. It was further shown in the evidence that there was much plowed ground between where Monk Gibson was when he said he saw the men chasing Mrs. Conditt and the Diggs' house where he first went, and yet it was the testimony of all the witnesses that there were no tracks leading across this plowed land to the Diggs place, which land he must have crossed if he had gone directly, as he says, to give the alarm. It was shown in the evidence that there was in the room where Mrs. Conditt was found the prints of two bloody hands, both very much alike, and both singular and remarkable in that they showed plainly the imprint of three fingers, and a mere dot which might have been made and was made by a crippled little finger or part only of the little finger. A careful examination and comparison of a print made by the hand of Felix Powell showed that these bloody imprints were in every respect identical with the imprint of Felix Powell's hand. It was shown in the testimony that Felix Powell admitted and stated to numerous persons that he and Monk Gibson had killed the Conditt family; that he had got what he wanted for a long time, evidently referring to the outrage of the tender body of the little girl. That the murder was committed by some one familiar with the premises and who knew the inmates of the house, is very evident. If there had been the slightest alarm before they were attacked, Mrs. Conditt and her daughter could easily have escaped in the yard and made some outcry. They were in plain view of the public road, and within less than two hundred yards of the Diggs' house where John Diggs was working in the field and where Augusta was washing. There was no outcry or alarm at the Conditt place. If there had been, it could easily have been heard by the Diggs people. Clearly the attack upon these defenseless people was a surprise, and most probably could have been made only by some one whose presence was either entirely unknown or whose presence did not excite suspicion or alarm on the part of the inmates. The two boys were murdered evidently by some person

whose approach to them excited no alarm. If they had been struck
before Mrs. Conditt and the children at the house were killed, it is
likely that this fact would have been discovered by them. If there had
been any alarm at the house before they were assaulted, or if Mrs. Con-
ditt had been killed as the result of an encounter, these boys could easily
have given some alarm or made some effort to escape. Mrs. Conditt
was unquestionably murdered by being struck in the back of the head
with the adz on the premises. Mr. Conditt's testimony shows that on
the morning of the murder when he was leaving the house the adz
was lying out in the yard; that he stepped on it, and afterwards threw
it under the edge of the front gallery. It was shown that the Conditt
house was on the prairie, and any approach to it could have been easily
seen by Monk Gibson who was plowing near by, if made from any direc-
tion, and it is inconceivable that these five persons could have been
murdered without his knowledge; nor can it be believed that strangers
seeing a man plowing in the field a short distance from the house and
two boys on the opposite side of the house at work on a fence, would
have undertaken to have gone there for the purpose of murder and rape
of women unknown to them, in broad daylight. It is the experience of
all mankind that a criminal does not commit crimes especially such as
this in the very presence and hearing of witnesses and leave them alive.
The evident object of this crime was rape. It was certain beyond any
doubt that the little girl, Mildred Conditt, had been ravished, whether
by one man or by both we have no means of knowing; nor is it posi-
tively known whether Mrs. Conditt was assaulted or not, as no exam-
ination was made, or had an examination been made the physicians say
such fact could not have been definitely ascertained. The murder of
the two boys at the fence and of the little 4-year-old boy in the house,
could only have been for one purpose, and that was to destroy the wit-
nesses who knew them, leaving only a babe of a few months of age alive,
and this little fellow in the midst of the wreck and ruin of a home,
the solitary remnant left from the assassins' work. It is a fair deduc-
tion from all the testimony that the crime was committed by some
person known to the family, whose presence in and about the house ex-
cited no alarm. Appellant was such a person, and had been working
and eating at the Conditt place for several days at the time of the
murder, and was well known to each of the children. He was un-
doubtedly in the immediate neighborhood of the house and immediately
preceding and shortly after the murder. He had been plowing in the
field probably one hundred or one hundred and fifty yards from the
house early in the morning. Shortly after Augusta Diggs began wash-
ing clothes at her father's house, she saw him plowing in the field with
Felix Powell walking up and down the rows with him. However, in
the early part of the morning Irene Powell, who was washing at the
house of a Mrs. Orr, near the Conditt place, looking in the direction
of her house saw his plow and oxen standing in the field with no one
about them. This was about the time when most probably the murder

occurred. After that time and about 11 o'clock he was again seen plowing in the field by the witness Raleigh and others. About this same time Felix Powell was on his way to the town of Edna, and spoke to Raleigh and Cylla Holmes in the road opposite the Conditt place.

It will be remembered that if appellant had gotten blood on his feet in the way that he states he did; that is, by being pushed over the body of Mrs. Conditt, and in this way stepping in the blood flowing from her lifeless body, that there would necessarily have been barefoot prints on the floor of the house both from the blood where he had been forced to step, and also on other portions of the floor where he walked. There was not, however, a footprint of any kind in the blood, nor a bloody footprint on the floor in any part of the house. The testimony of several of the witnesses show that the blood on the legs of appellant was sprinkled or spurted on them; that is, in drops, some of which had run and coagulated, and up as high as half-way up to his knees. This blood could not have gotten on this portion of his legs in the manner claimed by him; that is, by stepping in it. The physicians all testify that from wounds such as the throat being cut, blood would have spurted and sprinkled some distance. It is evident that the blood on his person must have gotten on his body in such manner as this. As stated above, notwithstanding he was in only one room where he could just see the body of the girl, Mildred Lee, he was able to give and did give a particular description as to how she was killed; that is, that her throat was cut, which could not have been seen without turning the body over. He also described particularly the wounds on the little boy who was killed and thrown on the outside of the house. All the information thus disclosed and given by him indicates very clearly that he must have been at and about the house at the very time of the murder, or have made a particular inspection of same after the murder was committed. Mr. Conditt testified that on the morning of the murder, just before going to work, he told appellant to change the point on his plow, and told him the plow point to be put on was near the grindstone, some thirty-five or forty feet from the house where Conditt had left it there that morning. When he returned that evening the plow point was in a tool chest on the gallery of the house, showing beyond doubt that Gibson had been to the house. The ground around the place where the two boys were murdered while at work on the fence was carefully guarded during the day of the murder and no one allowed to approach it on foot, and it remained in this condition until the bloodhounds arrived. The track of a bare foot of a man referred to above was measured by Judge Guy Mitchell with a stick which he kept, and was not only found to correspond exactly with Gibson's foot, but showed the person making the track to have gone first in the direction of the Powell house and then at an angle off toward the Diggs' house, and when a short distance from it was lost in the edge of a flat, which, while in wet weather was a pond, was at the time of the murder very dry and hard. It was shown that in a conversation with W. S. Crawford when he went to see Gibson in

jail upon one occasion, and among other things told him in substance that they had discovered all about the murder and that it had occurred about 10 o'clock in the morning instead of about noon as he (appellant) had tried to make it appear, that thereupon appellant replied that it was even earlier than that, which was practically a confession of guilt on the part of appellant. Mr. Crawford also says that he stated to appellant that they had Augusta Diggs, and that when he indicated to appellant that Augusta Diggs had turned State's evidence, or had made a disclosure of the facts known to her, "He turned ashen; that before this he had been laughing about the matter; that every time he would talk to me about it he would treat it as a joke, but when I told him we had gone through the examining trial and we had learned that they had killed the Conditt family about 10 o'clock instead of 12 o'clock, as they tried to prove on a former trial, that he straightened up and turned ashen and said, 'No, sir, it was sooner than that.' That this was the first emotion he had ever seen him display. That he was kinder sitting in a leaning position, and when I told him that he straightened up and said, 'No, sir, it was sooner than that!' "

We have not undertaken at all to give all the details of the killing. The statement of facts is very voluminous, and contains almost five hundred pages of typewritten matter. The State's case was marshaled with care and consummate skill, and after a very careful review of all the facts, our minds rest on the moral certainty that appellant was guilty of the murder of Mrs. Conditt and her children.

1. Appellant was indicted jointly with Felix Powell in several counts. The first count charges that Felix Powell and Monk Gibson murdered Lora Conditt by then and there striking the said Lora Conditt with an adz. The second count charges the murder of Mrs. Conditt by Felix Powell and Monk Gibson by striking her with some blunt instrument, a better description of which the grand jurors were unable to give. The third count charges the murder of Mrs. Conditt by Felix Powell by striking her with an adz, and that appellant before the commission of said murder by Felix Powell did unlawfully and with malice aforethought command and encourage the said Felix Powell to do and commit said murder, and that he did then and there agree with said Felix Powell to aid him in committing said murder, he the said Monk Gibson not being personally present when said offense was committed by the said Felix Powell. The fourth count of the indictment is in all respects identical with the third, execept that it is charged that Felix Powell committed the murder of Mrs. Conditt by striking and beating her with some blunt instrument, a better description of which the grand jurors were unable to give. The fifth count charges that Felix Powell murdered Mrs. Conditt by striking and beating her with an adz, and after the commission of said offense of murder by the said Felix Powell, and well knowing that said offense had been committed by the said Felix Powell and with the purpose and in order that the said Felix Powell might evade arrest and trial for said offense so committed by him did

unlawfully and wilfully conceal same and give aid to the said Felix Powell. The sixth count in the indictment is in all respects identical with the fifth, except it is averred that Felix Powell murdered Mrs. Conditt by striking and beating her with some blunt instrument, a better description of which the grand jurors are unable to give.

2. Appellant's motion for a new trial embraces sixteen grounds upon which a new trial is sought. The first ground of the motion is that the verdict and judgment are contrary to the law and evidence. Our finding on the facts makes it unnecessary to further consider this ground.

3. The second ground of appellant's motion is as follows: "The court erred in overruling this defendant's motion for a change of venue and dismissal of said cause from the docket of the district court for the reason that said defendant was first indicted in Jackson County, Texas, for the murder of Mrs. Lora Conditt, by a grand jury of said county, October 9, 1905, and on October 17, 1905, the district judge of said county, of his own motion changed the venue of said cause from said county to Bexar County, Texas, and giving the following reasons for so doing: 'The judge presiding at this court being of the opinion that owing to the fact that this case has become exceedingly notorious and has, by reason of that fact, been widely and universally discussed by the people generally throughout this section of the county; and a large number of leading and influential citizens of Jackson and adjoining counties have to a very large extent, interested themselves in working up the case in the effort to ascertain the true facts of the case and apprehend the party or parties,' etc., it is the opinion of the court therefore, in view of all these facts that a speedy trial of this cause alike perfectly fair and impartial to the State and the defendant cannot be had in this county, therefore the presiding judge of this court (who is also the presiding judge of the court hearing this motion, said Jackson County and DeWitt County, being in the same judicial district) now here and of his own motion in open court, orders that the venue of this cause be and the same is changed to Bexar County, Texas.' "Defendant says that' the conditions above set out by said trial and presiding judge being true at the time he made said order are doubly true at this time, for the reason that said cause has become more notorious, more widely discussed in Jackson and DeWitt and adjoining counties and in fact in every county in this judicial district, from the fact that this defendant was subsequently tried in Bexar County, Texas, and said case against him dismissed from the docket of said county, and from the further and additional fact that the codefendant, Felix Powell, has been subsequently tried, sentenced and executed in Victoria County, the adjoining county to said DeWitt County, in the same judicial district; and the fact that this record will show that 120 special veniremen and additional talesmen in two lists to the number of seventy men were exhausted before a jury was finally secured to try said cause, the defendant having fully exhausted his challenges before the three last jurors were selected and sworn to try said cause; all of said facts, and the whole

record in this case, showing that defendant should not have been tried in said DeWitt County, Texas, and it evidently being the opinion of the presiding judge of this court in the original transcript changing the venue of said cause to Bexar County, Texas, that the defendant could not secure a fair and impartial trial in this judicial district 'or throughout this section of the county,' wherefore defendant says that his affidavit for a change of venue and his motion of a dismissal of this cause from the docket of the court in said DeWitt County should have been granted.

"In this connection defendant would further remind the court with all humility and respect, that the machinery of our courts is not instituted and established for the purpose of vengeance, but that justice may be done, and that simply because a jury of Bexar County, Texas, failed and refused to convict this defendant, is no reason in law or justice that said cause should have been removed to DeWitt County, Texas, in order that the result, attained in this present trial might be consummated and this defendant finally have his life taken from him at the tender age of 17 years to appease the will of any number or any class of citizens of this judicial district." It appears from the record that when the case was called for trial in the District Court of DeWitt County, appellant filed a motion to dismiss the case on the ground that the order or judgment of the District Court of Jackson County did not show that the statute had been complied with in changing the venue, and this motion to dismiss being overruled by the court, was duly excepted to. The record shows the judgment of Jackson County, and shows the presence of the defendant in court when the motion was granted, and also shows that he was at the time represented by counsel. That the defendant was duly arraigned and had pleaded not guilty, and that the venue was thereupon changed by the court to DeWitt County. Article 621, of our Code of Criminal Procedure, is as follows: "The order of the judge granting or refusing a change of venue shall not be revised upon appeal, unless the facts upon which the same was based are presented in a bill of exceptions prepared, signed, approved and filed at the term of the court at which such order was made," and it has been uniformly held in this State without exception that the ruling of the court in granting or refusing a change of venue will not be revised on appeal unless the facts upon which the ruling is based are presented in a bill of exceptions prepared, signed, approved and filed at the term of court at which such order was made, and unless the bill of exceptions contains the evidence, the question will not be considered. See Adams v. State, 35 Texas Crim. Rep., 285; Kutch v. State, 32 Texas Crim. Rep., 184; Smith v. State, 31 Texas Crim. Rep., 14; Miller v. State, 31 Texas Crim. Rep., 609; Jackson v. State, 30 Texas Crim. App., 664; Blackwell v. State, 29 Texas Crim. App., 194; Pruitt v. State, 20 Texas Crim. App., 129; Bowden v. State, 12 Texas Crim. App., 246; Wright v. State, 40 Texas Crim. Rep., 447; 50 S. W. Rep., 940. Likewise, exception must be taken and reserved to the court by which the change was ordered. Krebs v. State, 8 Texas Crim. App., 1; Preston

v. State, 4 Texas Crim. App., 186; and Ex parte Cox, 12 Texas Crim. App., 665. This rule is not only statutory, but has been so often decided and enforced that it can no longer be said to be a debatable question in Texas. The jurisdiction of the new forum cannot be called into question by plea of jurisdiction, unless exceptions are saved to the action of the court changing the venue in the court granting such change, and in such new tribunal a party cannot attack the court from which the venue has been changed by a plea of jurisdiction. Bohannan v. State, 14 Texas Crim. App., 271, and Rothchild v. State, 7 Texas Crim. App., 519.

4. Again, complaint is made that the court erred in failing to change the venue, on application, from DeWitt County. Application was made for a change of venue by appellant, which motion was sworn to by him, but was not supported by the assisting affidavit of two or more credible persons, nor was there any reason assigned why appellant did not procure assisting affidavits. Article 615, of the Code of Criminal Procedure, is as follows: "A change of venue may be granted on the written application of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine: 1. That there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial. 2. That there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial." In the first place it has been held in this State that a defendant is entitled to only one change of venue. Rothchild v. State, 7 Texas Crim. App., 519, and Webb v. State, 9 Texas Crim. App., 490. But it is not necessary to place the decision of this question on that ground. It has been the uniform ruling of this court that before a defendant is entitled to a change of venue, that the provisions of the statute must be complied with. The application must be supported by affidavits of at least two credible persons residents of the county where the prosecution is instituted. This requirement is not complied with by the supporting affidavit of the defendant himself and one other person. O'Neal v. State, 14 Texas Crim. App., 582. It has even been held that where there was filed an affidavit alleging the existence of so great a prejudice in the county against him as to prevent a fair trial, but that persons could not be induced to make affidavit of such prejudice, and defendant asked for process for certain persons, residents of the county, who, affiant believed, would testify to the existence of such prejudice, the application did not comply with the statute. Mitchell v. State, 43 Texas, 512; Wall v. State, 18 Texas, 683. This question was fully considered in the case of Willis Macklin v. State, decided at the recent Dallas Term, where we reached the same conclusion and made the same holding.

5. Again, it is insisted that there was error in the action of the court in refusing to sustain appellant's challenge to the talesmen summoned

by the sheriff when all the names of the special venire had been exhausted, counsel for appellant contending that the Act of the Twenty-Ninth Legislature repeals the law that had previously existed authorizing the sheriff to summon talesmen, and that a jury could only be obtained through the act of a jury commission, and any act of the court ordering the sheriff to summon talesmen was not only illegal but void. By an inspection of this act (see page 17, Acts Twenty-Ninth Legislature) it will be seen that title 8, chapter 2, of the Code of Criminal Procedure, was amended by adding article 647. This amendment was intended to provide and did provide that no juryman drawn by the jury commission should be required to serve or be drawn on but one venire in a capital case, but this act does not either expressly or by implication repeal article 648, which provides that, "Where there shall not be a sufficient number of those selected to make the number required for the special venire, the court shall order the sheriff to summon a sufficient number of good and intelligent citizens, who are qualified jurors in the county, to make the number required by the special venire." See Weathersby v. State, 29 Texas Crim. App., 278, and Deon v. State, 37 Texas Crim. Rep., 506. We cannot believe, therefore, that there was any error in this action and ruling of the court.

6. The charge of the court was not excepted to either at the time it was delivered, nor is same criticised or questioned in appellant's motion for a new trial. It was a clear, definite, lucid, succinct statement of the law of the case, and is not attacked in any way by counsel for appellant. They requested, however, on the trial, a number of special charges, which we will now consider. The first special charge is as follows: "You are instructed at request of defendant that the defendant is presumed to be innocent until his guilt is established by legal and competent testimony, beyond a reasonable doubt, and that this presumption of innocence follows the defendant through every step of the trial, and until his guilt shall be established by *direct* testimony or else may be inferred from facts found; but I instruct you that before you can infer the guilt of this defendant you must find that the facts found have been *strictly proved* by testimony of witnesses under whose observations they have actually and directly fallen, and the guilt of the accused should follow *easily* and *naturally* from the facts proved and must be consistent with all the facts proved and not inconsistent with any other reasonable hypothesis than that of the defendant's guilt, and I instruct you that if you find the testimony in this case wanting in any of the above essentials, you will find the defendant not guilty." This charge, we think, should not have been given. It is argumentative, and on the weight of testimony. The court's charge covered and included everything that ought to have been given which was embraced in this charge. The court charged on circumstantial evidence in this language: "In this case the State relies for a conviction upon circumstantial evidence, and in order to warrant a conviction upon such evidence each fact necessary to establish the guilt of the accused must be proved by competent evidence,

beyond a reasonable doubt, and the facts and circumstances proved should not only be consistent with the guilt of the accused, but inconsistent with any other reasonable hypothesis or conclusion than that of his guilt, and producing in your minds a reasonable and moral certainty that the accused committed the offense." The court also instructed the jury, as follows: "The defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence, beyond a reasonable doubt; and in case you have a reasonable doubt as to the defendant's guilt you will acquit him, and say by your verdict 'not guilty.'" In addition to this, on every different and varying phase of the case, the court in express terms submitted the doctrine of reasonable doubt. In view of the court's charge, the requested instruction, even if in all respects correct, need not have been given, since the court had already instructed the jury fully and thoroughly on the subject covered by the special charges.

7. Appellant's counsel also requested the following special instruction: "When the admissions or confessions of a party are introduced in evidence by the State, then the whole of such admissions and confessions are to be taken together, and the State is bound by them, unless they are shown by the evidence to be untrue. Such admissions or confessions are to be taken in consideration by the jury as evidence in connection with all of the other facts and circumstances of this case." In this State where the confessions and admissions of a defendant constitute the principal incriminative evidence against him, it is not only proper but sometimes may be required that the court should instruct the jury that the burden rest upon the State to show that such admissions or confessions were untrue. Such a charge was approved in the case of Pharr v. State, 7 Texas Crim. App., 472, and in the case of Coombes v. State, 52 Texas Crim. Rep., 613; 108 S. W. Rep., 649, it held that such a charge substantially should have been given. In both those cases, however, the admissions and confessions offered in evidence were as to the fact of the homicide, which was in terms admitted. In this case there was no admission or statement admitting the killing, but seeking to justify and excuse same. Many daclarations were offered in evidence, but these were statements of collateral and incidental facts shown to be untrue, and offered in evidence by the State as tending to show the account given by appellant was untrue, known by him to be untrue, and, therefore, incriminating evidence against him in that they must show an effort and scheme to shield himself from the force and effect of his presence at the scene of the homicide, and other facts tending strongly to connect him with the murder. We do not believe, therefore, that such a charge was either required or that it would have been proper to have given same.

8. The following special charge was also requested: "You are further instructed, at the request of defendant that you will not consider any evidence in the case tending to show the guilt of Felix Powell in the murder of Mrs. Lora Conditt as evidence against the defendant,

Monk Gibson, in this case, but can only consider said evidence to establish the guilt of said Felix Powell as a principal, as a basis upon which the State seeks to establish the guilt of the said Monk Gibson, and no further." This charge, in substance, stated the law correctly, and was included in the general charge of the court. On this question the court instructed the jury as follows: "You are instructed that you will not consider any evidence in this cause of any statement or declarations of Felix Powell, if any, for any purpose except in considering whether said Felix Powell was guilty of the offense of murder of Lora Conditt as charged in the indictment and you will not consider any such testimony, if any, in any manner affecting this defendant upon the trial of murder against him in this cause, either as a principal or as an accessory." This charge of the court was all that was required to be given, and was indeed but a paraphrase of the special charge requested by counsel for appellant.

9. There are a number of other special charges requested, but none of them, we think, should have been given. They have been carefully considered by us, but are of such character as do not call for discussion.

10. The serious question in the case is the action of the court in admitting the testimony of several witnesses as to statements and disclosures made by Felix Powell to them after the killing of the Conditt family. These matters are properly embraced and included in appellant's bills of exception Nos. 7, 8, 9 and 10. In these declarations, made to many witnesses, Felix Powell, said in substance, that he and Monk Gibson had killed the Conditt family, and in some of them gave some of the details of the murder. This testimony was objected to on the ground that same was hearsay, and made in the absence of appellant; that it was not admissible on the theory or ground of a conspiracy for the reason that such statements or admissions were made after the murder and, therefore, after the termination of the conspiracy. So that we are confronted with the proposition as to whether the declarations of the principal, or the confessions of the principal, are admissible against an accessory after the commission of the crime, where such confession embodies language that implicates the accessory; or whether this testimony will of necessity be treated as hearsay and, therefore, inadmissible. It will be remembered that the indictment charged murder direct against Felix Powell and appellant, and also included counts charging appellant as being guilty as an accessory. It will be conceded that if appellant stood alone upon trial for murder that this testimony would not be admissible. It was not, however, offered to prove defendant guilty of murder, and the court expressly charged the jury both by verbal statement at the time same was admitted, as well as in his written charge to them, that it could not and must not be considered or used for that purpose. So that, the question recurs, was it admissible against the defendant where he was charged as an accessory? It has been repeatedly held by this court that in the trial of a party indicted as an accomplice or an accessory, the State must prove the guilt of the

principal beyond a reasonable doubt, and that in such case the court must charge the jury that such testimony is offered for that purpose, and in the trial of the accomplice or accessory any proof which would be admissible and legitimate in the trial of the principal, would also be legitimate and admissible in the trial of the accessory for the purpose of establishing the guilt of such principal. This precise question was before this court in the case of Simms v. State, 10 Texas Crim. App., 159, where the whole question was thoroughly considered and elaborately discussed by Judge White. That case, as reported, shows it was well briefed by learned counsel, and bears intrinsic evidence of careful and painstaking study. There were two counts in the indictment, one charging the defendant with the crime of murder, and the other charging that the crime was committed by one Plummer, but that before its commission he was incited, hired, encouraged, advised and aided in its execution by Simms, the defendant. In the first count he was charged as a principal offender, and in the second as an accomplice to the murder. There was in that case a motion to require the State to elect on which count the prosecution would rely. In this state of the case, Judge White says: "Under the count charging the defendant as a principal, whether alone or in connection with others, the prosecution might have shown and have established not only the existence and actual perpetration of the deed in connection with other parties, but, having once established such conspiracy, would have been entitled, against the co-conspirator on trial, to prove any act, declaration or admission of the confederate or confederates not on trial, done and said in pursuance of the common design and in furtherance of it up to the time of its commission, but no further." Such rules, he says, however, do not obtain, "where an accomplice is being tried separately from his principal. Accomplices under our Code would in most of the States and at common law be denominated accessories before the fact, and, save in cases specially excepted, the rules applicable elsewhere to the latter with us apply to the former. McKeen v. State, 7 Texas Crim. App., 631; Arnold v. State; 9 Texas Crim. App., 435. Where a party is being tried as an accessory before the fact, or as an accomplice, it is essential as a predicate for, or condition precedent to, his guilt, that the State should establish the guilt of the principal; for his guilt is dependent on that of the principal, whether the latter is on trial or not. Whart. Crim. Ev., sec. 602; Arnold v. State, supra. But in thus establishing the guilt of the principal on the trial of the accomplice, the prosecution, when the confederacy between the two has been shown, is not limited to what was said and done by the principal before the consummation of the act; but, in addition thereto, the acts and conduct of the principal immediately following the commission of the deed, and tending to show he committed it, are competent evidence to prove the guilt of the principal. Whart. Crim. Ev., 702; State v. Lewis, 45 Iowa, 20." Proceeding further, he says, "And so also with subsequent confessions made by the principal. We are aware that a contrary rule was formerly held. Mr. Russell, in his

celebrated work on Crimes, says: 'Upon an indictment against an accessory, a confession by the principal is not admissible to prove the guilt of the principal; it must be proved *aliunde.*' 1 Russ. on Crimes (9th Ed.) side p. 76. This doctrine is based upon the leading case of Rex v. Turner, 1 Mod. Cr. Cas., 374. In the well considered case of Hartwell v. U. S., 3 Clifford, C. C. R., 221; Judge Clifford in discussing Turner's case says: 'If viewed as deciding that the confessions of a principal in a case where the principal and accessory are indicted and tried together are not admissible to prove the guilt of the principal, it is clearly opposed to the general course of decisions in criminal cases for centuries, and it is difficult to see why any different rule should prevail where the principal is first convicted, provided they are both joined in the same indictment. Many cases where criminal justice cannot be administered if the rule is as supposed by defendants. Take for example, the case of an accessory in murder, where the principal is not upon trial because he pleaded guilty in the presence of the court and jury. Conviction of the accessory cannot take place without first proving the guilt of the principal, and his guilt cannot be shown without proving he committed the homicide with malice aforethought.' Such evidence is clearly admissible against the principal when he is on trial, and if it is not admissible in the trial of the accessory to confirm the prima facie presumption resulting from the record of the principal's conviction in a case like the present, then there can be no such confirmation; which cannot be admitted.

"Our statute provides that, 'an accomplice may be arrested, tried and punished before the conviction of the principal offender, and the acquittal of the principal shall not bar a prosecution against the accomplice, but on the trial of an accomplice the evidence must be such as would have convicted the principal. Penal Code, art. 89. In Arnold's case it was said, in discussing a similar question, 'It being then necessary for the State to show the guilt of the principals, all legal evidence of whatever character is admissible. Therefore, motives, threats and confessions of the principals, and in fact evidence from every legal source, is competent.' 9 Texas Crim. App., 435. Another rule of law equally well settled, and which should not be overlooked in this connection, is that, 'deliberate confessions of guilt are among the most effectual proofs in the law, and that rule is applicable to the party who made the confession as well as when he is tried with others as when he is tried alone.' 1 Greenl. Ev. secs. 215, 233; Ros. Crim. Ev. 37, 52." Further discussing the question, Judge White says: "It was also error to permit the confessions and declarations of Plummer, made after his arrest, to Squire Gregory and others, to be introduced against this defendant under the first count; and, if admitted under the second count, the jury should have been expressly charged that they would consider them only with reference to Plummer's guilt, and not as evidence of the guilt of defendant, except as far as his guilt was dependent upon the establishment in the first insistence of Plummer's guilt. The charge nowhere limits

the evidence to this object, and to that extent the charge failed to apply the law to the facts under the second count, and was insufficient." The action of the court in this case followed absolutely the rule and doctrine laid down in the Simms case. In the first place, as the record shows, when the State announced that it then proposed to offer evidence tending to show the guilt of Felix Powell as a principal, the court stated to the jury that this testimony would be considered by them solely and only for the purpose of establishing the guilt of Felix Powell, and not as an evidence of the guilt of appellant. This was followed up by exactly the charge approved and suggested in the Simms' case. The rule and doctrine in the Simms' case seems to have been applied with rare intelligence in this case, and the action of the court in every respect conforms to the law as laid down in the case discussed. The same question was considered by the court and discussed at some length in the case of Crook v. State, 27 Texas Crim. App., 198. That case is one of the most famous and well considered cases in the books. There certain evidence of admissions and declarations of an alleged principal was offered in evidence against the appellant, and in discussing the matter the court say: "In a prosecution against a defendant charged as an accomplice, it is essential for the State to establish the guilt of the principal of the crime charged to have been committed by him. In this case it was essential for the State to establish the guilt of John Middleton, the alleged principal of the murder of James H. Black. Without proof of Middleton's guilt as principal, the defendant could not be convicted as an accomplice. In establishing the guilt of Middleton any evidence which would have been competent, had he been on trial was competent on the trial of the defendant as an accomplice, not for the purpose of proving that defendant was an accomplice, but for the purpose solely of proving that Middleton committed the murder, and the degree of the murder. (Penal Code, art. 89; Arnold v. State, 9 Texas Crim. App., 435; Poston v. State, 12 Texas Crim. App., 408; Whart. Cr. Ev. sec., 602).

"If Middleton had been on trial his detailed confession made to Holman would have been admissible in evidence against him, and was therefore admissible evidence in this case to prove his guilt as principal in the murder of Black, but not to prove that the defendant was an accomplice in that murder, or had any guilty connecting with it. It was not error, we think, to admit the testimony of the witness Holman, detailing the confession of Middleton. In the charge to the jury, the purpose for which this testimony was admitted was clearly explained to the jury, accompanied by the emphatic instruction that it could not be considered against the defendant for any purpose, but could only be considered for the purpose of showing that Middleton may have killed Black. These remarks were applicable also to the testimony of the witness Christopher, detailing Middleton's confession made to him of the murder of Black. Simms v. State, 10 Texas Crim. App., 131." These cases were ample authority for and in every respect sustain the

action of the trial court. In this case there was no motion to require an election on the part of the State. As the case stood, in the absence of such motion to require an election, a conviction might have been had either as a principal in the murder, as an accessory or as an accomplice. Any testimony that legitimately tended to establish the guilt of appellant under either of the counts was admissible, and where, as in this case, the jury were in terms instructed that the testimony which was admissible under the charge against appellant as an accessory, could not be considered as proof of his guilt, we can see no possible ground of complaint on the part of appellant. If there was any suggestion in the record that the prosecuting officers of Jackson County, or the county where the case was tried, had included and sought to prosecute appellant as an accessory with the covinous intent and design under the guise of such prosecution of getting before the jury testimony which would not be admissible on a direct charge of murder, we would not hesitate on such a showing to reverse the case, but there is no suggestion of this sort in the record, nor is it made by counsel for appellant.

11. Complaint is made that the court committed material error calculated to injure the rights of appellant in that after the court had overruled defendant's motion for a change of venue, and for dismissal of said cause on the docket of said court, appellant by his attorneys asked for a postponement of said trial in order that they might have an opportunity to prepare themselves for the defense of appellant, and to secure to him all the rights to which he was entitled under the law in the defense of his life, it being made to appear that said attorneys had been recently appointed by the court, and it being claimed that they had not had time in which to make preparation for his defense, and not having seen, as they claimed, any of the witnesses in the cause for the State or appellant before the day and hour upon which the case was called for trial, and thereby the defendant was deprived of the right of being properly represented by counsel when he was placed upon trial for his life, as he was entitled to under the Constitution and laws of this State. The motion to postpone and for further time in which to prepare for trial was included in appellant's motion to dismiss the case because of the improper change of venue from Jackson County, and is substantially in these words: "That should the court refuse to grant this motion and require him to go to trial on this cause in this county, then he would move the court to grant him further time in which to prepare for trial of this cause, and especially time in which to secure certain evidence for which he had subpoena duces tecum issued to Bexar County, Texas, for the district clerk of said county and the original papers filed in the case formerly pending against this defendant in said Bexar County." This was a motion peculiarly addressed to the discretion of the trial court. What the testimony was or what the papers were which were desired to be had from Bexar County is not made to appear; nor is there anything in the record that suggests that appellant was injured by the failure of the court to delay the trial. While we can conceive of a case where arbitrary

action of the court in a matter of this sort might result in such injury as to cause reversal, we apprehend that such cases would be rare, and certainly on a mere matter of procedure peculiarly under the direction and control of the trial court we should not interfere and reverse a case unless it appeared that some injustice was done. As presented, we can not see that appellant had brought himself within any rule which would justify us in interfering.

12. Again, complaint is made of the misconduct of the district attorney in his argument to the jury. It is urged that the case should be reversed by reason of improper argument of counsel for the State. As shown by bill of exceptions, during his argument the district attorney, in his address to the jury, made the following remark: "Do not let it be said, gentlemen of the jury, that a jury of DeWitt County citizens can only hang a white man," which language and remark of the district attorney were objected to at the time, for the reason that same was highly prejudicial to the defendant, and calculated to prejudice the jury against him, and influence their minds against him, and especially when it was a fact as claimed by appellant within the knowledge of all within hearing of the district attorney and the members of the jury that a white man only up to the present time had been hanged in said county, and said remark was a flagrant and unauthorized violation of the rules of argument, and not in reply to any remark in argument by the defense, because the said district attorney was at that time making the opening speech to the jury in the cause, and which remarks and declarations of the district attorney were at the time excepted to. The bill is approved with the explanation that the district attorney, when said remarks were objected to on the part of the defendant, explained to the court and the jury that same were made because of the questions asked by the counsel in empaneling the jury as to their prejudice against the defendant and the negro as a race, and also because of the question by defendant's counsel to each juror on their qualification on voir dire whether they would give the defendant as fair a trial as if he were a white man.

13. Again, it is claimed that there was misconduct in the argument of the district attorney, in the course of his address, in commenting upon the depraved nature, violent character and criminal disposition of the defendant, to substantiate which he cited and instanced the fact as testified to by the witness Irene Powell that the defendant had hanged the said Irene Powell's daughter by the neck and severely injured her, which remarks and comment by the district attorney were objected to by the defendant at the time they were made for the reason that appellant had offered upon the trial of said cause to explain and show the real and true facts of said incident, and that said episode was only a child's act in play. It is shown that when objection was made the court remarked to the district attorney that he thought he was not fair in commenting upon said testimony when the defendant had not been allowed to introduce evidence in explanation of said incident, to which remarks and comments appellant excepted. This seems to have been the extent, prop-

erly interpreted, to which the argument ran. We are not advised by the record as to the matter of fact as to whether any one else had theretofore been hanged in DeWitt County, nor do we deem it important as to whether persons of the white race only had been so punished. The court's remark to the district attorney, in the presence of the jury, in respect to the other remark objected to, was sufficient to remove any injurious impression made thereby, and in the absence of any further request by appellant to the court for instructions in respect to same, we do not deem said matters of sufficient gravity to justify us in reversing the case.

14. Again, complaint is made of the action of the court in admitting in evidence certain photographs of the Conditt premises offered in evidence by the State. As we gather from the record, a considerable number of photographs of the Conditt place were offered in evidence, taken from many points of view and directions, and all for the purpose, as we understand, of showing the size and location of the house and particularly . that same was located in an open space on the prairie, and so situated that any one approaching same could easily have been seen. It may be that these photographs were incidentally offered for some other purpose, but as we apprehend from a careful study of the record this was the main purpose for which they were introduced. It was not shown very definitely just when they were taken, but there was evidence offered tending to show that the photographs were taken after the case had originally been transferred to Bexar County, and either at the suggestion or by the aid of the prosecuting officers of that county. Some of the testimony indicates that they were taken in December of 1905. All the testimony shows that the house itself and the grounds near it were in practically the identical condition that same were in at the time of the murder. The proof does show that a plank which had been knocked off or taken down in the hall way, near where the little boy was found, had been nailed back at the time the photographs were taken, but in every other respect the situation was practically unchanged. The correctness of the different views and of the premises, as shown by the photographs, was testified to without any dispute or controversy, by a number of the witnesses, and all of them said, in substance, that the photographs contained true and correct representations of the status at the time of the murder. The objection made was that the witnesses, among others, Mr. W. W. McCrory, county attorney, had stated that they did not know when the photographs were taken, or whether they were taken at the same season of the year of the murder, or whether they were taken in the same year, and that said photographs were not properly proven up and authenticated. As stated by the court, in his explanation, this witness (as other witnesses), testified, "That he identified the country represented in the photographs and that he knew the photographs to be correct photographs of the premises which the purported to represent." These photographs were admissible, we think, on the same ground as diagrams, plats, etc. have been held admissible in this State. It has been held that

diagrams made by a surveyor or other party, after it has been shown to be correct by the delineator or surveyor, is competent and legitimate evidence to explain the testimony of witnesses in regard to the locus in quo of the homicide to enable the jury to better understand to apply the evidence. Rodriquez v. State, 32 Texas Crim. Rep., 259, and Smith v. State, 21 Texas Crim. App., 277. It has also been held proper and legitimate for the purpose of explaining the testimony of the witness and rendering it more intelligible than it would have been otherwise, to introduce diagrams, maps and plats. It is said that this serves the purpose of enabling the jury to better understand and to apply the evidence with reference to the various localities spoken of by the witnesses. Carter v. State, 39 Texas Crim. Rep., 345. This seems to be the general rule, and to have received the approval of many courts in this country. McClain on Criminal Law, sec. 406, lays down this doctrine: "Photographic views taken near the time of the homicide showing the condition of the premises on discovery of the crime, and satisfactorily verified, are admissible." Commonwealth v. Robinson, 162, Mass., 90; State v. O'Reilly, 126 Mo., 597; People v. Jackson, 111 N. Y., 362. The same rule has received the approval of Mr. Wharton, in his valuable work on criminal evidence. See section 544; Blair v. Pelham, 118 Mass., 420; Church v. Milwaukee, 31 Wis., 512; Cowley v. People, 83 N. Y., 464. In the last case, the court say: "We do not fail to notice, and we may notice judicially, that all civilized communities rely upon photographic pictures for taking resemblances of persons and animals, of scenery and all natural objects, of buildings and other artificial objects. It is of frequent occurrence that fugitives from justice are arrested on the identification given by them. 'The Rogues' Gallery' is the practical judgment of the executive officers of the law on their efficiency and accuracy. They are signs of the things taken. A portrait or a miniature taken by a skilled artist and proven to be an accurate likeness would be received on a question of the identity or the appearance of a person not producible in court. Photographic pictures do not differ in kind of proof from the pictures of a painter. They are the product of natural laws and a scientific process. It is true, that in the hands of a bungler, who is not apt in the use of the process, the result may not be satisfactory. Somewhat depends for exact likeness upon the nice adjustment of machinery, upon atmospheric conditions, upon the position of the subject, the intensity of the light, the length of the sitting. It is the skilled operator that takes care of these, as it is the skill of the artist that makes correct drawing of features and nice mingling of tints for the portrait." Again, it is said, "A plan or picture, whether made by hand of man, or by photography, is admissible in evidence, if verified by proof that it is a true representation of the subject, to assist the jury in understanding the case." Marcy v. Barnes, 16 Gray., 161; Hollenbeck v. Rowley, 8 Allen, 473; Ruloff v. People, 45 N. Y., 213. Again, it has been held that photographs of the scene of a crime if proven to correctly represent the place as it was at the time of the commission of the crime, are

admissible in evidence. 9 Enc. of Ev., p. 781; Mow v. People, 31 Col., 351; 72 Pac., 1069; Keyes v. State, 122 Ind., 527; 23 N. E., 1097; State v. Herson, 90 Me., 273; 38 Atlantic, 160; Commonwealth v. Chance, 174 Mass., 245; 54 N. E., 551; Commonwealth v. Robertson, 162 Mass., 90; 38 N. E., 25; Shaw v. State, 83 Ga., 92; 9 S. E., 768. It has also been held that where photographs are shown to be correct representations of a place or locality where the transaction under investigation took place, as it appeared at the time of the transaction, they are admissible in evidence without regard to the time when they were taken. 9 Enc. of Ev., 778; Barker v. Perry, 67 Iowa, 146; 25 N. W., 100; Baustian v. Young, 152 Mo., 317; 53 S. W., 921; 75 Amer. State Rep., 462; Leeds v. New York Tel. Co., 79 App. Div., 121; 80 N. Y. Supp., 114. In the last case the injury was received in April, 1902, and the photograph was taken in October of the same year, but there was proof that it correctly represented the situation at the time of the accident except that the hole shown in it was deeper than when the picture was taken. The photograph was nevertheless held admissible. Other authorities might be cited, but, as stated, the rule is well settled that such photographs on proper proof are admissible.

15. Appellant again insists that substantial injustice was done him on the trial of his case, for which the case should be reversed, for the reason that the race to which he belongs was discriminated against in the selection of a special venire, and in the selection of two lists of talesmen summoned in this cause from which he was bound by the ruling of the court to select the jury which tried the cause, in that there were no persons of his color or race on the original special venire of 120 men, although there are a large number of negroes in DeWitt County, subject and qualified for jury service; nor were there any persons of the defendant's race and color on the first list of fifty talesmen summoned by the sheriff to complete the jury in said cause, although as alleged there was a large number of negroes subject and qualified for jury service who were available and convenient for such purpose; and that when said list of talesmen was returned into court he made his motion to quash the same, and he was thereupon required to challenge a sufficient number of said talesmen picked up in the town of Cuero, but exhausted his challenges without a jury having been completed in said cause, and the court repeated the error above noted and required the sheriff to summon an additional list of twenty talesmen from which to complete said jury, upon which said list said sheriff summoned four negro jurors, the State at that time still having four challenges left and defendant none, which action of the court, and the sheriff under its direction, it is claimed, was prejudicial and discriminated against him on account of his race. As it appears in the record, this matter was called to the attention of the court in a written motion to quash and hold for naught the additional venire and talesmen summoned by the sheriff and his deputies, for the reason, among other things, "That upon the list of veniremen chosen by the commissioners aforesaid the

defendant is informed and believes there were selected jurors of the negro race; and defendant would further show that he is a member of said negro race, and as such is entitled that no discrimination be used against his race and against him in the selection of jurors; and defendant would further show to the court that there are in the County of DeWitt and State of Texas more than one hundred negroes qualified for jury service, of which fact he herein now tenders proof and would further show that in the selection of the talesmen the sheriff has failed to secure or present among said number any of the members of this defendant's race from which he might select jurors." The appellant's bill is approved by the court with the explanation that there was no evidence as to discrimination. From this explanation, which was accepted as true by appellant's counsel, and which, of course, we must accept as absolutely true, it is manifest that there is no merit in this contention.

16. It is urged again that the court should have granted a new trial in the cause because the evidence shows the defendant to have been only 16 years of age at the date of the commission of the alleged homicide, and the jury could not have legally returned a verdict inflicting the death penalty in said cause. There was some testimony tending to show that appellant was at the time of the commission of the offense under the age of 17 years. On the other hand, this testimony was impeached and, contradicted by the admissions and declarations of his mother, who gave this testimony both verbally and in written instruments signed by her. There was testimony by other persons of a somewhat similar and conclusive character that he was more than 17 years of age when the murder was committed. This was a question of fact for the jury on conflicting evidence, which they have resolved against appellant. The verdict affirming the penalty of death has received the sanction and approval of the trial court, and in this condition of the case we are without authority to interfere.

17. These comprise practically all the questions raised, and they are all the questions of a substantial character, we think, arising on the record. We have with as much care as is possible gone through the case and given the same our deliberate and careful consideration. There was, as we believe, no error committed on the trial of the case of which appellant can complain. While the testimony is circumstantial, and while having regard for the fallibility of human reason, the appellant may be innocent, we have not thought so, but have been led to the conclusion by proof that compels acceptance, that his guilt is incontestably established by such testimony as admits of no escape. So believing, it is our duty to affirm the judgment of the court below, and it is done.

*Affirmed.*

Brooks, Judge, absent.