## ALBERT TEBO V. THE STATE.

No. 18597.   Delivered May 26, 1937.
Rehearing Denied June 25, 1937.

The opinion states the case.

*H. C. Happ,* of Beaumont, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; penalty assessed at confinement in the penitentiary for thirty years.

Appellant worked at night at the Eagle Cafe in Port Arthur, Texas. The deceased worked in the day time at a barber shop

situated a short distance from the cafe. About two o'clock in the morning the deceased entered the cafe. He engaged in a quarrel with the appellant which resulted in a fist fight on the outside of the cafe. After the fight, the parties returned to the cafe, and in a few minutes the deceased left, stating that he was going home. The appellant went to his home (which was near the cafe) and changed his shirt which had been torn in the fight mentioned. He rode to his home in an automobile belonging to a friend. Upon returning to the cafe, appellant claims that he was fired upon by the deceased who used a .22 calibre rifle. On the following morning the appellant quit work about 7:30 o'clock and went to a taxi stand for the purpose of advising the officers that he had been fired upon by the deceased. He took his pistol with him. According to some of the testimony, the appellant went to the barber shop where the deceased worked and made inquiry as to his whereabouts. He also expressed a threat to kill the deceased. However, this was controverted by the appellant. The appellant claims that while he was at the taxi stand the deceased walked up, cursed him and threatened to kill him, whereupon he shot and killed the deceased.

Appellant introduced in evidence the written statement of a witness who had died since the tragedy, which statement reads as follows:

"When he (Tebo) walked out of the office the last, I was sitting in the back seat of the car, and I looked at him and he met Eddie Francis and Eddie walked right up close to Tebo and seemed to be smiling. They passed a few words. I did not hear what they said. Eddie Francis stepped back, stuck his hand in his right front pocket in his pants and seemed to pull up his pants. Then Tebo reached in his side and pulled out a black pistol and shot at Eddie Francis. The first shot looked like it might be aimed for his head or about there. He dropped lower and shot Eddie Francis in the body. I am positive there were five shots by Tebo. The boy was down after the third shot and he made two more after he was down on the ground."

It is contended by the appellant that the court was in error in failing to instruct the jury on the law of murder without malice as embraced in Article 1257c, P. C., which reads as follows:

"In all cases tried under the provisions of this Act it shall be the duty of the Court, where the facts present the issue of murder without malice, to instruct the jury that murder without malice is a voluntary homicide committed without justifica-

tion or excuse under the immediate influence of a sudden passion arising from an adequate cause, by which it is meant such cause as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection, and in appropriate terms in the charge to apply the law to the facts as developed from the evidence."

Apparently the contention that the statute mentioned should have been given as an instruction to the jury must rest upon the occurrences taking place at the time of the killing. Touching those events the testimony of eye-witnesses is as follows:

The State's witness, Peter Sampay, testified:

"Just prior to the killing Eddie Francis and Albert Tebo were standing right close up on one another. They were standing about that far apart (indicating, about a foot and a half or two feet). They were standing there talking and Eddie Francis dropped his hands this way (indicating) and jumped back and then is when the pistol went off. I saw both of his hands. Eddie Francis did not have anything in his hands at all that I could see. * * * After Eddie Francis fell Albert Tebo fired some more shots at him; in fact he fired one more shot at him after he was down. * * * After Tebo shot Eddie five times he walked off that way, (indicating)."

The witness R. B. Blackstone testified:

"I saw the shooting that day; I saw all of it. * * * I saw Eddie Francis around the taxi stand first that morning. Eddie had not been there so very long before I saw Tebo come up there. * * * It appeared to me, the way I looked at it, that Tebo approached Eddie to talk to him. Tebo went over and talked to Francis. I couldn't hear what they were saying to each other. * * * Francis was standing there talking to Tebo with his hands in position like this (indicating). Both hands were out like that (indicating) and all at once Tebo shot him. All at once Tebo shoved him off and began shooting him. He shot him until he fell. When he fell then he shoved the gun right down on him and shot him again, and when he got through he walked right across the street right in front of me."

On cross-examination Blackstone testified:

"The first movement that was made, that I can tell, was when Tebo shot him—or began shooting him. I hadn't seen Eddie make any movement like he wanted to fight or anything of that kind before Tebo shoved him and commenced shooting him. That is all I seen."

In rebuttal the State introduced the witness Robert Lee, who testified as follows:

"I saw that shooting that morning. * * * I was right across the alley from the shooting. * * * Before the shooting took place I was setting down there and Eddie Francis was coming towards his home. * * * When he walked to the car—he took both hands like that (indicating) and pulled his pants up. He didn't have a coat on; he didn't have anything in his hands either. Just at that time Tebo must have said something to him, because I seen their lips moving but I couldn't hear. Francis threw up both of his hands and Tebo started shooting, and at the third shot Eddie went to the ground and Tebo kept shooting. After Tebo shot him he went across the street towards the cafe."

As stated above, the appellant was an employee at the Eagle Cafe and worked at night. The deceased worked in a barber shop in the day time. On the morning of the tragedy, the appellant quit his work and went to a taxi stand at about 7:30 o'clock and remained there until about 9:30, at which time the deceased came on his way to the barber shop where he worked. In the meantime the appellant went to the barber shop and made inquiry for the deceased. Upon being advised that the deceased was not there, the appellant returned to the taxi stand and there waited until the deceased came.

If appellant had killed the deceased during the alleged conflict on the night before the tragedy his contention for an instruction on the law of murder without malice might have been plausible. However, the appellant brought on the conflict on the following day, and his conduct on the morning on which the homicide took place does not warrant a charge on murder without malice.

Finding no error justifying a reversal of the conviction, the judgment of the trial court is affirmed.

*Affirmed.*

LATTIMORE, JUDGE.—I concur in the affirmance of this case.

HAWKINS, JUDGE (dissenting).—Conviction is for murder, punishment thirty years in the penitentiary.

Appellant presents several questions arising from exceptions to the court's charge. The only one discussed is the complaint at the failure to define and apply the law of murder without

malice. The other questions are not thought to present serious error, if any.

The court defined murder, and malice aforethought, and in a number of places advised the jury that unless appellant acted with malice in killing deceased his punishment could not be more than five years in the penitentiary. The complaint is that nowhere in the charge was the jury advised what constituted murder without malice. It is contended that such issue was raised by the evidence. If the issue was raised it is no answer to the complaint of a failure to instruct on it to say that the penalty inflicted shows that the jury found appellant guilty of murder with malice. The jury does not know to this day what murder without malice is unless someone has told them since the trial, for they received no information upon the subject from the court during the trial.

In 1927 the 40th Legislature, Reg. Sess. (Ch. 274) enacted that "Whoever shall voluntarily kill any person within this state shall be guilty of murder," thus re-defining murder. At the same time the old manslaughter law was repealed. The punishment for murder was fixed at death, or confinement in the penitentiary for life, or for any term of years not less than two. It was further provided (Art. 1257a) that either the State or defendant should be permitted to offer testimony as to *all relevant facts and circumstances and the previous relationship of the parties going to show the condition of mind* of the accused at the time of the homicide which might be considered by the jury in determining the punishment. The Legislature, however, was not long satisfied to leave the law in such unrestricted condition so far as the penalty was concerned. The same Legislature at the 1st C. S., page 18, Ch. 18 (1257b), enacted that in all cases tried under the murder statute the court should define "malice aforethought" and tell the jury that unless from all the facts and circumstances they believed the defendant acted with malice aforethought, the punishment could not be longer than five years. Still not satisfied with the situation, the Legislature in 1931 (42 Leg., p. 94, Ch. 60) defined murder without malice, and directed how the jury should be instructed on the subject, as follows:

"In all cases tried under the provisions of this Act it shall be the duty of the Court, where the facts present the issue of murder without malice, to instruct the jury that murder without malice is a voluntary homicide committed without justification or excuse under the immediate influence of a sudden passion arising from an adequate cause, by which it is meant such

cause as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection, and in appropriate terms in the charge to apply the law to the facts as developed from the evidence."

Thus, in effect, the Legislature put back in the statute in a general way the principles of the old manslaughter statute under the new name of "murder without malice," omitting, however, the particular things which had formerly been adequate cause.

The question here is, Do all the facts and circumstances here present raise the issue of murder without malice, that is, a voluntary killing upon adequate cause? In determining that question the inquiry may not be restricted to the facts at the immediate time of the killing, nor to a provocation arising at the time of the commission of the offense. The judgment of conviction in Riley v. State, 123 Texas Crim. Rep., 353, 59 S. W. (2d) 134, was reversed because of such a restriction in the court's instructions. See also Privett v. State, 123 Texas Crim. Rep., 86, 57 S. W. (2d) 1102, in which is quoted the language of Judge Lattimore in Butler v. State, 121 Texas Crim. Rep., 288, 51 S. W. (2d) 384, as follows:

"The remainder of said act is as follows: 'And in appropriate terms in the charge to apply the law to the facts as developed from the evidence.' Manifestly this means that, in a case where there is testimony raising the issue of murder without malice, the trial court must in appropriate terms instruct the jury, in substance, that, if they believe, or have a reasonable doubt thereof, from all the facts and circumstances in evidence, both those occurring at or about the time of the homicide, or prior thereto, that the mind of the accused was in such condition of sudden passion arising from an adequate cause as to render it incapable of cool reflection, and that such cause or causes, if any, was such as would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection, and that, while in such condition of mind, the accused committed the offense charged, then they could not assess a penalty of more than five years in the penitentiary."

Youngblood v. State, 121 Texas Crim. Rep., 465, 50 S. W. (2d) 315. In Lewis v. State, 89 Texas Crim. Rep., 345, 231 S. W., 113, this court said:

"Appellant was dependent almost wholly on his own testimony for the contention that the issue of manslaughter was in

the case. If any evidence raised the issue, the determination of it passed from the court to the jury, under appropriate instructions. 'In a doubtful case the charge on manslaughter should be given.' Pickens v. State, 86 Tex. Cr. R. 662, 218 S. W. 755; McLaughlin v. State, 10 Tex. App. 359; Arnwine v. State, 49 Tex. Cr. R. 6, 90 S. W. 39. 'After all the evidence is in, if it is questionable in the court's mind as to whether the issue of manslaughter is raised, it should be resolved in the defendant's favor, and the matter passed to the jury.' Steen v. State, 225 S. W. 531."

Further in said opinion it is said:

"The jury had the right, and it was their province, to believe any part of the testimony of appellant or any other witness, which to them seemed reasonable, and, on the other hand, to reject all or any part to which they did not give credence. The jury evidently rejected appellant's testimony, in which he claims that deceased shot at him before he killed deceased. Having found against appellant, on the issue of self-defense, they still had a right to believe that deceased and his son made an assault on appellant, and that the three of them became engaged in a fight and struggle, and from this alone, or in connection with previous abuse and assault with the monkey wrench, appellant's mind became so inflamed from anger, rage, resentment, or terror as to render him incapable of cool reflection, and that the facts and circumstances were sufficient to produce such a state of mind in a person of ordinary temper. If they should have reached such a conclusion from the evidence, no rule is given them in the charge directing them what to do under such a finding." See also Garland v. State, 106 Texas Crim. Rep., 141, 291 S. W., 244.

The name of deceased was Eddie Francis. For clearness in stating the facts he will be called by name, as will also appellant. Tebo worked on the night shift at a cafe. His testimony was that he had known Francis about two years. There had never been any trouble between them. On the night before the killing Francis was in the cafe engaged in an argument with the cook. Tebo asked Francis to "cut out" the cursing, whereupon he started to cursing Tebo and asked him outside to fight. They went outside and engaged in a fist fight. After it was over they went back in the cafe and Francis then cursed Tebo, calling him various kinds of s— of b—, and said he was going to kill Tebo the next morning when Tebo got off from work. This was between two and three o'clock in the morning. After Francis left the cafe Tebo went home in a car to change his

shirt. As he was starting back to the cafe Francis fired at him twice with a .22 rifle, one of the balls striking the car door near Tebo's head. When Tebo got back to the cafe he reported the shooting to Grelena, owner of the cafe. I quote now from appellant's testimony:

"When I got off from work that morning I went over to the taxi stand to use their telephone to report that he had shot at me and threatened to kill me. The reason I wanted to report it to the officers was *because I was afraid of him and wanted some protection.* * * * I rang up the constable's department and the lady told me that he was not there then, so I waited awhile and rang him again. I put in two calls for him. I just stood around on the outside of the stand during the time I put in the first and second calls. * * * The first time I saw Eddie Francis that morning was when I was starting to put in the third call on the phone. I was standing over in front of the taxi stand when Eddie came up there. * * * I saw Peter Sampay over there that morning. I asked him could I use the phone. It was his taxi stand and his phone. Peter was setting in his car. When Eddie Francis walked up there he said, 'Well, Tebo, you taken advantage of me last night by my being drunk,' and I said, 'No, I didn't you cursed me and asked me to come out doors and I went,' and he said, 'God damn you, you didn't have no business coming out doors,' and I said, 'I don't want to have no trouble with you,' and he said, 'You remember what I promised you,' and he made an effort to get in his front pocket. He attempted to get in his pocket after something, that is what I mean. He did not raise his hands up in the air. He raised this one at his pocket. When he raised that hand I pulled my gun then. I pulled my gun and shot him; I shot him because I was afraid he would kill me—he said he would. * * * The last thing he said just before I shot him was 'You remember what I promised you,' those were the words he used, that was the last statement he used when he backed off, 'You remember what I promised you.' After he said that he reached in his pocket. He had something in his pocket but what it was I could not tell."

In his cross-examination Tebo repeatedly testified that he was afraid of Francis. He said he was not scared at the time he went home to change his shirt because at that time Francis had not shot at him, but that after this occurred he was afraid.

A number of witnesses testified to seeing the bullet hole in the car, describing its location, as did Tebo. Linson, the cook at the cafe, testified that Francis came into the cafe about one-

thirty o'clock at night; that he was drunk and cursed witness, then cursed Tebo and invited him out to fight; that when they came back in the cafe Francis said to Tebo, "If I don't get you at the present I will get you the next day," to which Tebo replied, "Go on, I don't want that out of you." Douglass testified that after the fist fight Francis was again cursing Tebo as a s— of a b— and trying to get him to go out and fight again; accused him of being a coward; and said he couldn't get Tebo in the cafe, but would catch him when he came down on 10th Street. Stovall testified that when Tebo and Francis came back into the cafe after the fist fight Francis said to Tebo "We are going to have it again," or "I will see you again." Sampay, a State's witness, testified that when they came back into the cafe Francis said to Tebo, "I'll meet you again." This witness operated the taxi stand where Tebo went to use the telephone. He confirms Tebo's testimony about asking permission to use the phone and said he used it more than once. He saw Francis come up to the taxi stand, and say something to Tebo, but could not hear what was said. His testimony was not in accord with Tebo's on the issue of self-defense. Bounera, who worked at the cafe, confirmed Tebo's story about why he went to the taxi stand. Witness said the phone at the cafe was a pay phone, and when Tebo reported to him about Francis shooting at him witness told Tebo to go to the taxi stand where there was a free phone and report it to the officers. Every State's witness who saw the shooting testified that Francis and Tebo said something to each other immediately before the shooting, but none of them heard what was said. Trainer, who worked at a barber shop where Francis was employed, testified that Tebo came into the barber shop a short time before the killing, inquired for Francis and threatened to kill him. Tebo admitted asking Trainer if Francis had been at the shop that morning, but denied making any threat to Trainer or anyone else that he was going to kill Francis.

I have not undertaken to set out the State's evidence, and it has been necessary to set out the defense evidence more at length than usual because the sole question as we understand it is, does the evidence raise the issue of a voluntary killing on adequate cause, not whether it establishes the truth of such issue. If the issue is raised it was for the jury to decide it, not this court, nor the trial court. As was said in Lewis' case (supra) the jury found against Tebo's claim of self-defense, but they were not required to believe all he said, neither were

they required to reject it all. They might have accepted part of his testimony as reasonable, and discredited part.

There seems no dispute about what occurred at the cafe the night before the killing. Francis went into the cafe, abused Tebo, invited him out to fight, then resented the result and threatened Tebo, who testified that later the same night Francis shot at him twice with a rifle, after which he was in fear of Francis. While the jury discredited Tebo's claim of self-defense, they may have believed that Tebo went to the taxi stand to report the matter to officers, and that while there Francis came to where Tebo was, immediately referred to the cafe incident and recalled the promise that he had made to meet Tebo again. If the jury did believe Tebo's story up to that point, taking into account Francis' conduct the night before, in cursing and threatening and shooting at Tebo, and believed his mind was disturbed by fear or resentment rendering it incapable of cool reflection, they had no instruction advising them what the law was nor what they should do under such circumstances. See Elsmore v. State, No. 18,803, decided April 14, 1937, not yet reported. (132, Texas Crim. Rep., 261.)

The court fell into error in not responding to appellant's complaint for the oversight in omitting to define murder without malice, including adequate cause. The judgment should be reversed and the cause remanded for a new trial. Not being able to agree with my brethren who have reached a different conclusion, I respectfully record my dissent.

## ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant's motion for rehearing is short, and rests on but one proposition, viz: that we erred in holding that the trial court was not required to charge on murder without malice, because,—and here we quote from the motion:

"The great weight of the credible testimony not only raises the issue but conclusively shows that the defendant, at the time of the homicide, from circumstances immediately preceding it and occurring at the time, was laboring under great emotional stress occasioned by anger, fear and terror, arising out of adequate cause, which was calculated to and did render his mind incapable of cool reflection."

It thus plainly appears, and is so stated that appellant's reliance is entirely upon "circumstances immediately preceding" the homicide; and upon those "occurring at the time,"—as evidencing his right to the charge on murder without malice. We

specially call attention to this, because what is thus stated,—as the basis of appellant's contention,—is in exact accord with the position taken by Presiding Judge Morrow, in a paragraph of his opinion, of which in oral argument upon the motion appellant's counsel complained, in which paragraph we said:

"Apparently the contention that the statute mentioned should have been given as an instruction to the jury must rest upon the occurrences taking place at the time of the killing."

In said paragraph we were not attempting to lay down a rule of law applicable to other cases on other facts, but were simply saying that under facts such as here appear, there is nothing tangible supporting the idea of sudden passion, rage, terror, etc., arising from an adequate cause,—growing out of, arising from, or because of any occurrence taking place prior to the morning of the homicide.

The facts show that sometime after midnight on the morning of November 9, 1935, this appellant ordered deceased out of a cafe or beer tavern where appellant worked, and after some argument they went outside and had a fight in which appellant had the better of the difficulty; also it is claimed that deceased made some threats, this being about 2 or 3 o'clock A. M.; also that appellant claimed that he left the cafe in a car, went home, changed his shirt, and on his way back to the cafe deceased shot at him, the bullet lodging in the car door. No one else seems to have seen or heard this claimed shooting, though appellant showed several people the bullet holes in the car door. This seems to have ended the performances in the nighttime.

Appellant quit work at about 7:30 A. M. We note that one of appellant's witnesses swore that when appellant came in the cafe, after his fight with deceased, he had a pistol holding it in his hand under his apron. Appellant disclaimed having this pistol at all, but does claim after he got off work at 7:30 A. M. he went to his room and got his pistol and brought it to the cafe. At this point we might conjecture as to why appellant, armed with his pistol, came back to the cafe after 7:30 A. M. instead of going peaceably to bed as ordinarily would be expected of a man who worked at night and had been up all the preceding night.

That appellant returned to the cafe armed with a pistol at about 7:30 A. M. is undisputed. We let him testify at this point, because this is what his attorney claims shows his mental condition, and which is supposed to furnish a basis for appellant's motion for rehearing above referred to. We quote:

"I got the gun just to protect myself. I hadn't called the

police for any protection up to that time. When I told my boss about the trouble we had had and he had shot at me, he told me to go call the law. It was his idea that I should call the law. I called the constable's department for protection. I didn't call the city police officers. That was inside of the city limits that we had had the trouble. I did not call the police for protection. I didn't figure on killing that boy; I just got the gun for protection. I figures on protecting myself and wouldn't have to call the constable's department."

The man to whose taxi stand appellant went, to act upon his boss' suggestion that he phone the officers, was a witness on this trial, and detailed the facts, including the killing, but his testimony is utterly devoid of anything supporting any theory of excitement or sudden passion on the part of appellant. This witness says that appellant came to his place about 7:30 A. M. and remained around there until the killing, which was about 9:30 or 10 A. M. He said this taxi stand was in sight of the barbershop where deceased worked, and same seems to have been on the route ordinarily traveled by deceased in going to work. Appellant went to this barbershop, apparently while wainting at the taxi stand, and inquired for deceased, but was told he had not come. The proprietor of said barbershop testified that appellant then told him that deceased was not going to shine any shoes that day, and when asked why, appellant said "Because they had some trouble that night, and anywhere he saw him that day he was going to kill Eddie, or Eddie was going to kill him." Witness asked appellant not to do this, and appellant replied: "Well, one just had to die." Neither this witness nor anyone else in the barbershop at the time said that appellant was excited or apparently under the influence of sudden passion, etc. The proprietor of said shop testified that appellant left some twenty or twenty-five minutes before he heard the shots of the killing. This man also testified that when appellant made the above statement, he looked like he was mad and intended to do what he said he was going to do.

Appellant was waiting at this taxi stand when deceased came along, not far from 10 o'clock. A sister of deceased said he came home the night before about 1 o'clock, went to bed and did not leave the house that night. Five eye witnesses to the killing testified; two, including appellant himself, testified for the defense, and three for the State,—and no one of these said appellant gave any evidence of sudden passion, etc. Appellant stoutly maintained that he shot deceased in self-defense. We let him speak:

"On the morning of the shooting when I went over to that stand to use the 'phone, I had my gun with me at that time. I had been carrying that gun every since I went out to the house and got it. When that boy walked up there where I was I didn't make up my mind right then and there to kill him. No sir, I didn't make up my mind to kill him. I didn't kill that boy just because we had had a little fight the night before. I didn't kill him on account of the little trouble we had at the cafe that night. I did not have a grudge against him for what we had done that night. The only thing I killed him for was the movement—when he told me that he was going to kill me and made a grab at his pocket. He threatened to kill me at the cafe."

Again appellant said:

"When I fired that first shot I was just thinking about trying to stop him from killing me, because he had made an attempt to go into his pocket, I didn't know what he had."

One of the defense witnesses, Polite, swore as quoted in our original opinion that when deceased walked up to appellant just before appellant shot him, deceased seemed to witness to be smiling. These eye witnesses make out a complete case of cold-blooded murder. As above stated, appellant on the other hand made out a case of self-defense.

Inspection of Art. 1257c makes clear the proposition that no duty rests upon trial judges to submit murder without malice in homicide cases until and unless,—to quote said statute, "The facts present the issues of murder without malice." It is plain that, in the first instance, the trial court must pass on the question as to whether the facts before him present such issue. It is equally plain, under all the authorities, that this court will not reverse for the refusal of the trial court to so submit,—unless we believe such action an abuse of the discretion necessarily confided in the trial court in such matters. Our decision, if adverse to that of the court below, should be based on perceptible facts and not on conjectures.

The case of Riley v. State, 125 Texas Crim. Rep., 353, was reversed because in the charge of the court language had been used, borrowed from the old law of manslaughter,—which, in a case such as was that case, was upon its facts clearly wrong. That was a case in which the killing was claimed to be the result of alleged infidelity of the wife of the accused, and what was there said has no sort of application to a case on facts such as the one before us, as inspection will readily show. So also of the case of Privett v. State, 123 Texas Crim. Rep., 86, which

presents a case of a man of exceedingly low mentality, said by witnesses to have about the mind of a twelve year old child, who killed another to whom he attributed a course of insulting conduct toward his female relatives, culminating in a threat to kill the accused so he would have free access to his sister and sister-in-law. In both these cases reference is made to what we said in Butler v. State, 121 Texas Crim. Rep., 288, and in all three of the opinions referred to we but stated what is a plain and unanswerable proposition of law applicable to the case at bar as well as to those referred to, that is, that in a case where there is testimony raising the issue of murder without malice, the trial court should submit such issue to the jury.

There can be no debate over the proposition that appellant's own testimony can put such issue in a given case, but it must be put there by testimony and in no other way. Under the law prevailing in this State for many years antecedent menaces, former grudges, lying in wait, etc., etc., were provable as supporting express malice, and a killing was reducible to manslaughter when done in sudden passion arising from an adequate cause. We have in this case no suggestion of insult to female relatives or other kindred causes of passion. Whatever evidence there may appear in this record of a supposed threat by deceased, and its effect upon the charge, was completely furnished appellant in connection with his claim of self-defense; but this record, as we view it, is wholly devoid of testimony calling for a charge on murder without malice. The learned trial judge fully and fairly defined malice, and told the jury if they found that appellant was not actuated by malice, they could not assess a punishment of more than five years. The verdict assessed thirty years.

The motion for rehearing is overruled.

*Overruled.*

HAWKINS, JUDGE (dissenting).—My views remain the same as expressed in the dissenting opinion on original submission, and for the reasons there expressed it is my judgment that appellant's motion should be granted, and the judgment of conviction be reversed.