Dolphus Jack BROWN, Appellant,

v.

The STATE of Texas, Appellee.

No. 43685.

Court of Criminal Appeals of Texas.

Oct. 26, 1971.

Rehearing Denied Jan. 26, 1972.

Blanchard, Clifford, Gilkerson & Smith, Travis D. Shelton, Lubbock, Joseph A. Calamia, El Paso, for appellant.

Blair Cherry, Jr., Dist. Atty., Thomas J. Purdom, County Atty., Alton, Griffin, Lubbock, and Jim D. Vollers, State's Atty., Austin, for the State.

OPINION

ONION, Presiding Judge.

Appellant was convicted of murder with malice in the 34th District Court of El Paso County following a change of venue from the 137th District Court of Lubbock County. Punishment was assessed by the jury at 13 years.

The one count indictment charged the appellant with killing D. J. Brown and Birdie Brown, shown by the evidence to be his parents.

The appellant urges 30 grounds of error. Among these grounds of error appellant challenges the sufficiency of the evidence to sustain the conviction. Since a discussion of this question will aid in placing the other grounds of error in proper perspective, we shall commence with this contention.

At approximately 4 or 4:15 a. m. on April 18, 1967, Deputy Sheriff Earl Woodard of Lubbock County received a call and went to the Brown farm near Shallowater with Deputy Jackie Knox arriving there around 4:35 or 4:45 a. m. When the deputy sheriffs arrived the appellant, his uncle, A. C. Henderson, and two ambulance drivers were present at the house. The officers found the bodies of D. J. and Birdie McCauley Brown. The lower portion of Mrs. Brown's body was on the bed, but the upper portion was off the bed with her head resting on a blood soaked pillow on the floor. She was clothed in a nightgown. The body of D. J. Brown was lying face down on the floor close to the doorway leading into the hall. He was wearing undershorts. As the autopsy reports subsequently showed, both individuals had been brutally beaten on the head with a blunt instrument and had died as a result of brain damage inflicted by the beatings. The instrument used was never found.

The appellant told the officers the house was locked when he came home around 4 a. m. from playing poker and discovered the bodies of his parents; that he had then called his uncle who in turn called the sheriff's office. The deputies noted there was no sign of forced entry and only one window was open four or so inches with the screen latched. The front door was bolted from the inside. They did observe a broken lamp in the bedroom where the bodies were found, a full pot of stew or soup on the kitchen stove and a man's wedding band with three pennies lying in the kitchen cabinet. In the bedroom they found a pair of pants containing an empty gold money clip, some car keys, loose change and a billfold with three dollars in it. These items were turned over to the appellant. The Justice of the Peace arrived shortly after 6 a. m. to conduct an inquest. After the bodies were taken to a funeral home he departed about 8 a. m.

The deputies left around 5:30 to 6 a. m. to talk to the individuals with whom the appellant claimed to have been playing poker.

At approximately 8:30 a. m. Chief Deputy Sheriff Lee Rice and Deputy Jackson arrived at the Brown house and found it locked, the Justice of the Peace having departed 30 minutes or so before. These officers then attempted to locate Clyde Fowler, appellant's uncle, and returned to the house shortly thereafter with Esdell Merrell, a relative of the deceased Birdie Brown who had a key to the house. They were unable to open the door with the key and Rice then crawled through a window and opened the kitchen door.

While they were there Deputies Woodard and Knox returned about 10 or 10:30 a. m. and Knox found a brown colored shirt in a clothes hamper near the bedroom. The shirt had on it two tiny spots of what appeared to be blood.

Shortly after noon the appellant and his uncle, Clyde Fowler, went to the District Attorney's office at the request of District Attorney Griffin. The interview which followed was attended by Deputy Rice and Texas Ranger Wilson.

The appellant was not given any warning, but was informed by Griffin that he was not under arrest; that the authorities had to begin their investigation into his parents' deaths somewhere and wanted to talk to him. Appellant then voluntarily agreed and proceeded to give the District Attorney an outline of his activities during the previous day and night. The 25 year old appellant related he picked up a girl, Anita Roberson, about 3 or 3:15 p. m. and checked into a Lubbock motel around 3:40 p. m. After staying at the motel awhile the couple then drove in his pickup truck to the Brown home near Shallowater but the visit was relatively short. No one was at the house and his father was in the field. They returned to the motel where the appellant left the girl. He then drove back home, changed shirts and informed his parents of his intentions to play poker that night. At this time he related his mother was wearing a short housecoat and his father was dressed in coveralls. When he left he took the family car rather than the pickup and drove back to the motel, arriving around 7:30 p. m., and went from there to a private home in Lubbock for the poker game where he played poker until 2 a. m. or so with the exception of a break of one hour when he returned to the motel and ate a sandwich. At 3 a. m. or so he revealed he checked out of the motel, took the girl home and drove to the house at Shallowater where he discovered the bodies.

When shown the brown shirt found by Deputy Knox he identified the shirt as his and admitted wearing it on April 17th until such time as he went home to change shirts between 5 and 7 p. m. He denied any knowledge as to how bloodspots had gotten on the shirt. When asked if he had changed other wearing apparel he slapped his leg and said, "No, these are the same pants I had on all day yesterday."

At the conclusion of the interview the appellant left the prosecutor's office with his uncle.

Deputies Rice and Jackson returned to the Brown residence that afternoon and cut pieces of carpet out of the hallway and bedroom which appeared to have blood on it. These items were sent to the Department of Public Safety for analysis.

Around 1:30 or 1:45 p. m. on April 18 Arthur Shelton, an employee at MacKenzie State Park in Lubbock, discovered the arm of the park's "Dempsey Dumpster" trash receptacle was broken. Looking into the receptacle he saw a bedspread, then a plastic bag with some bloody clothes in it, wet and bloody washcloths, towels and a pair of trousers with blood on them. The bundle was turned over to the sheriff's office.

Among the clothing was a dress which was identified as the dress Birdie Brown had been wearing on April 17 and a pair of coveralls which appeared to be the ones D. J. Brown had been wearing on the same date. In the pocket a gas credit card bearing his name and a cigarette lighter bearing the inscription of the Brown's Insurance Agency which was owned by the deceaseds were found. Both the dress and coveralls had been cut down the back from top to bottom. A wet bloody towel bearing the first initial of appellant's last name and the last four digits of his Army serial number was also found as were some washcloths.

Carol Cochran testified she had made a $200 loan to the appellant some two years prior to the alleged offense while both were in Germany, and that the loan had never been repaid despite the fact that appellant had promised her as late as a week or so before April 4, 1967, to send her a check. She related that in her efforts to contact the appellant concerning the loan she had telephone conversations with his mother, one of the deceaseds, on April 4 and again on April 17, 1967, the date of the alleged offense.

The deceaseds were shown to have eaten their noon meal in a Shallowater cafe on April 17 and about 1 p. m. the cashier observed that D. J. Brown had $18.00 and a

number of other bills contained in the gold money clip which was found empty the next morning near the bodies.

A Lubbock private club waitress testified appellant had asked her to change a $20.00 bill on the morning of April 17, 1967, but had then charged the drinks he had that day.

It was shown by other evidence that when he registered at the motel around 3:40 p. m. he offered to pay when he checked out. Upon the clerk's refusal, appellant produced a credit card and charges were placed against the same. When he checked out around 3 a. m. the appellant paid cash and retrieved the credit card charges.

It appears from the testimony the appellant needed at least $20.00 to get into the poker game. At one point another player bought appellant's chips, giving him a $100 bill for which appellant returned $35.00 in change which would indicate the chips were worth $65.00. The appellant was described as neither a big winner nor loser and the evidence would reflect the appellant had somewhere between $55.00 and $100.00 when he came to the game about 8 p. m.

The pathologist who performed the autopsies after the bodies had been embalmed testified he could not fix the exact time of death of either of the deceaseds with any degree of certainty.

The witness Casey testified she telephoned the Brown residence two times around 8 p. m. on April 17 and never received an answer.

The grand jury foreman testified the grand jury which returned the indictment was unable to determine the manner or means or the weapon or weapons used in the killings.

The appellant who did not testify relied upon alibi testimony. He calls attention to testimony showing he picked up Anita Roberson around 3:15 p. m. on April 17, checked into the motel around 3:40 p. m.,

was at his parents' home with Anita around 5 p. m. but stayed only a few minutes. Appellant points to Bruce Dillard's testimony that he saw the appellant and Anita at a liquor store east of Lubbock between 7:30 and 8 p. m. on April 17; that the poker players related he was at the game around 8 p. m., left about 9:15 p. m. and returned between 10 and 10:30 p. m., staying until about 2 a. m. on April 18; that the fact he returned to the motel during the break in the poker game is supported by testimony of Anita Roberson and the waiter who brought the sandwich he ordered to the room at 9:55 p. m.

Anita Roberson did testify that the appellant returned to the motel about 2:30 a. m. and she arrived home about 3:15 a. m. Her testimony as to the time of her arrival at the place where she then lived was corroborated by Patricia Ann Wilson with whom she lived.

The appellant also noted the testimony of the witnesses Baer and Krebbs that D. J. Brown was in the Shell Service Station in Shallowater between 6:45 and 7:15 p. m. on April 17 and that Birdie Brown was in the same station in her white car about 7:25 p. m. when other testimony placed the appellant in a liquor store approximately 15 or 20 miles away around 7:30 p. m. The evidence reflects that appellant was in the same white car.

Appellant notes that the original autopsy reports reflected the time of deaths as being between midnight and 4 a. m. and indicated the pathologist's uncertainty as to the exact time of death, and points to the testimony of another pathologist, a defense witness who had studied the autopsy reports, that such conclusion was correct.

The court charged on the law of circumstantial evidence and the defense of alibi.

We find the evidence sufficient to sustain the jury's verdict when considered in light most favorable thereto as this court is required to do. Jones v. State, Tex.Cr. App., 442 S.W.2d 698, 702.

While the time of the deaths or how long the deceaseds lived after injuries may not have been established with any exactness, it is noted that the stew or soup, apparently prepared for supper, was left untouched and repeated phone calls to the house at 8 p. m. went unanswered. The dress and coveralls worn by the victims during that day were split down the back apparently so as to facilitate their removal and were disposed of so as to give the appearance that the attack upon the victims had occurred after they had retired for the evening. Using washcloths and towels some effort was made to clean up some of the blood. This would not appear to be the act of a passing stranger or robber. Further, there was no sign of forced entry and little sign of a struggle indicating the attacker was known to the victims. The shirt and pants appellant was apparently wearing when he returned home the second time on the afternoon in question were shown to contain blood, the pants bearing the same blood type as that of his mother. The pants were disposed of along with the other items. At the time of the interview with the District Attorney appellant lied about changing his trousers at any time the previous day.

In Jones v. State, supra, this court stated:

"It is not necessary that every fact point independently and directly to the guilt of a defendant. It is enough if the conclusion of guilt is warranted by combined and cumulative force of all incriminating circumstances. Parish v. State, 85 Tex.Cr.R. 75, 209 S.W. 678; Finch v. State, 89 Tex.Cr.R. 363, 232 S.W.2d 528."

Further, in Taylor v. State, 87 Tex.Cr.R. 330, 221 S.W. 611 at 615, it was stated:

"The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. Shultz v. State, 13 Tex. 401; Hamlin v. State, 39 Tex.Cr.R. [579] 606, 47 S.W. 656; Porch v. State, 50 Tex.Cr.R. 335, 99 S. W. 102."

Appellant next contends the trial court erred in overruling his motion to quash the indictment and in requiring him to plead to a fatally defective indictment.

Omitting the formal parts, the one count indictment as alleged reads that "Dolphus Jack Brown did then and there unlawfully, willfully and with his malice aforethought voluntarily kill D. J. Brown and Birdie McCauley Brown by manner and means and weapon or weapons unknown to the Grand Jurors aforesaid."

The form used is certainly no model and is not to be commended, but it is not subject to the multifarious attack made upon it by the appellant.

■ It is well settled that an indictment which in one count charges the murder of two persons is not bad for duplicity if upon its face it does not show that the killings occurred at different times. See Rucker v. State, 7 Tex.App. 549; Chivarrio v. State, 15 Tex.App. 330, 334; Jones v. State, 89 Tex.Cr.R. 355, 231 S.W. 122; Turner v. State, Tex.Cr.App., 462 S.W.2d 9; 1 Branch's Ann.P.C., 2d ed., Sec. 526, pp. 502, 505. See also Good v. State, 98 Tex.Cr.R. 556, 267 S.W. 505.

■ As to any alleged violation of Article 21.24, Vernon's Ann.C.C.P., which prohibits charging more than one offense in the same indictment with certain exceptions, attention is called to Vannerson v. State, Tex.Cr.App., 408 S.W.2d 228, where this court refused to construe such statute as a prohibition against charging several ways in which one offense was committed

or charging more than one offense based upon the same incident, act or transaction.[1]

■ Further, we find no merit in appellant's claim that the indictment was defective for its failure to specify manners and means. Ordinarily, the means used to commit the charged offense should be alleged, but if the means used were unknown to the grand jury, or where it is doubtful how death was caused, it may be alleged that it was done by some means unknown to the grand jury. 29 Tex.Jur.2d, Homicide, Sec. 128, p. 150; 4 Branch's Ann.P. C., 2d ed., Sec. 2185, p. 529; Gentry v. State, 172 Tex.Cr.R. 345, 356 S.W.2d 793; Walker v. State, 14 Tex.App. 609, 627; Sheppard v. State, 17 Tex.App. 74, 81; Porter v. State, 86 Tex.Cr.R. 23, 215 S.W. 201; Bookman v. State, 112 Tex.Cr.R. 233, 16 S.W.2d 123; Stanley v. State, 120 Tex. Cr.R. 450, 48 S.W.2d 279.

The other grounds urged by the appellant as a basis for quashing this indictment are likewise without merit and do not require discussion.

■ Appellant also complains of the trial court's action in overruling his motion to resume the examining trial made after the return of the indictment.

The examining trial was conducted on May 1, 1967. This indictment was returned on May 3, 1967. The motion to resume examining trial was filed on September 5, 1967.

The return of an indictment terminates any right to an examining trial. Article 16.01, V.A.C.C.P.; Harris v. State, Tex. Cr.App., 457 S.W.2d 903, 907, and cases there cited. While, as pointed out in Harris, the examining trial may be a practical

tool for discovery by the defendant, the return of a true bill by the grand jury satisfies the principal purpose and justification for such preliminary hearing—that there is probable cause to believe the accused committed the crime charged.

■ Appellant relies upon Article 35.01, V.A.C.C.P., to support his claim that the court erred in refusing his motion for attachments to issue against absent prospective jurors who had been summoned and not properly excused from jury duty. The statute is directory, not mandatory, and any failure of the court to observe a literal compliance will not constitute reversible error in the absence of a showing of injury. There was no injury shown to have resulted from the trial court's action. No reversible error is thus perceived. See Article 35.01, supra, note #1.

■ Complaint is next made as to the failure of the court to quash the jury panel after a bailiff handed to each prospective juror a 23 page "Handbook for Jurors" published by El Paso County which he contends contains instructions and was in violation of Article 36.14, V.A.C.C.P.

Basically, this same contention was advanced in Walker v. State, Tex.Cr.App., 440 S.W.2d 653, and decided contrary to appellant's contention. The giving of such admonitory and cautionary instructions is largely within the discretion of the trial court and is often salutary in effect. Walker v. State, supra. The appellant fails to point out how he was harmed or prejudiced, and after our examination of the handbook of general instructions we fail to perceive any error. See also Rule 226a, Texas Rules of Civil Procedure.

---

1. While allegations as to two murders in one count of the indictment may not be invalid, it is difficult to understand why prosecutors insist on using such allegations. If it is done to insure proof of both offenses during trial, attention is called to the statement in 4 Branch's Ann. P.C., 2d ed., Sec. 2255, p. 618, where it is stated "[w]here the offense is one continuous transaction, or another offense is a part of the case on trial or blended or closely interwoven therewith, proof of all the facts is proper." See also Taylor v. State, Tex.Cr.App., 420 S.W.2d 601, 605; Cook v. State, Tex.Cr.App., 398 S.W.2d 284; Fuller v. State, Tex.Cr.App., 380 S.W.2d 619; Scott v. State, Tex.Cr.App., 471 S.W.2d 379.

It is observed that the use of handbooks for juror orientation is generally approved by the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury, Sec. 3.1 (Tentative Draft).

■ Appellant also complains of an oral instruction given by the trial judge when he empaneled the jury panel for the week for service in both civil and criminal cases in the district and county courts at law of El Paso County on the week of the instant trial.

The particular portion of the court's statements which is complained of by formal bill of exception reads as follows:

"The Texas law permits proof of any violation of the rules of proper Jury conduct. By this, I mean that Jurors and others may be called upon to testify in open court about acts of Jury misconduct. I instruct you, therefore, to follow carefully all instructions which I am now going to give you, and keep in mind that if you do not obey these instructions, the case on which you sit may result in a mistrial or the case might have to be tried over again."

This statement was clearly patterned after the approved instructions set forth in Rule 226a, Sec. II(10) (Written Instructions), T.R.C.P.

There was no objection to the instruction when given to the panel for the week on the morning of October 7, 1968. It was only after the jury panel for the case was brought to the trial court that the appellant moved to quash the jury panel "as a whole."

We fail to see how the instruction given before any of the jurors had been assigned to any particular court for the trial of any case was calculated to convey the trial court's opinion of the instant case in violation of Article 38.05, supra, as contended by the appellant. Sixty-nine of the prospective jurors to whom the remarks were made were retained for voir dire interrogation in the instant case. Only two of these served as jurors. To constitute reversible error in light of Article 38.05, supra, the comment by the court must be such that it is reasonably calculated to prejudice the accused's rights. Howard v. State, Tex.Cr.App., 420 S.W.2d 706.

We are will aware of those cases where reversal resulted because the trial court's remarks to the jury empaneled in criminal cases as to jury separation were held susceptible of interpretation by the jury as conveying the opinion of the trial court that the verdict would be guilty. Mahaney v. State, 95 Tex.Cr.R. 443, 254 S.W. 946; Ables v. State, 103 Tex.Cr.R. 456, 281 S.W. 858; Sheffield v. State, 165 Tex.Cr.R. 354, 307 S.W.2d 100; Snow v. State, 167 Tex.Cr.R. 183, 318 S.W.2d 893. An analysis of these cases would indicate that whether the court's remarks call for reversal depends upon the facts of each case. Ward v. State, 59 Tex.Cr.R. 62, 126 S.W. 1145; Hickox v. State, 95 Tex.Cr.R. 173, 253 S.W. 823; cf. dissenting opinion, Snow v. State, supra.

Certainly judges should studiously avoid any remark calculated to convey to the jury their opinion of the case. And it is true here that the instruction here complained of was designed by the Texas Supreme Court to be given in writing after the jury has been selected in a particular civil case and not to be given orally to an interchangeable jury panel for the week summoned for duty in both civil and criminal cases.

However, "[i]t must be borne in mind that many jury panels for the trial of criminal cases are selected and summoned in the same manner as provided in civil cases. See Article 33.09, V.A.C.C.P. When this provision is considered with the provisions for interchangeable jury panels, Article 2101, V.A.C.S., etc., it stands to reason that many jurors chosen in criminal cases will have been exposed to the admonitory instructions required by Rule 226a, supra."

Walker v. State, Tex.Cr.App., 440 S.W.2d 653, 658.

Under the circumstances presented, we perceive no error.

■ We further find no abuse of discretion in the court's action in refusing to permit individual voir dire examination of each prospective juror in absence of the other members of the jury panel. The State had waived the death penalty and at the time of such voir dire examination of the jury panel the case was no longer a capital felony case requiring separate examination of each prospective juror upon the request of either party. See Article 35.17, V.A.C.C.P. In addition, it should be remembered that a change of venue had already occurred and we find nothing to indicate the appellant was prevented from asking proper questions for fear of prejudicing the jury panel. Cf. Streight v. State, 62 Tex.Cr.R. 453, 138 S.W. 742.

Appellant next complains of the court's refusal to grant his "Brady v. Maryland" motion for discovery and his subsequent motion for the production of the grand jury proceedings. This court is well aware of the holding in Brady v. Maryland [2] (see i. e., Means v. State, Tex.Cr.App., 429 S.W.2d 490; Ex parte Cherry, Tex.Cr.App., 456 S.W.2d 949), but we fail to find any indication that material evidence that would have affected the determination of appellant's guilt or the punishment to be imposed was suppressed by the prosecution.

■ An accused is not ordinarily entitled to the inspection of grand jury minutes or testimony for the purpose of ascertaining evidence in the prosecutor's hands or for the purpose of discovery in general, regardless of whether the request therefor is made before or during trial. Garcia v. State, Tex.Cr.App., 454 S.W.2d 400, 403, and cases there cited.

The production of the grand jury testimony, of course, lies within the sound discretion of the trial court and the accused may be permitted to inspect such testimony where "some special reason" exists or where a "particularized need" is shown so as to outweigh the traditional policy of grand jury secrecy. Garcia v. State, supra; Smith v. State, Tex.Cr.App., 455 S.W.2d 748.

We cannot conclude that the appellant showed a "particularized need" for the grand jury testimony so as to reflect that the trial court abused its discretion in refusing to order its production. See 1 Branch's Ann.P.C., 2d ed., Sec. 103, p. 116.

■ At the hearing on the motion in arrest of judgment the court made available to the appellant for the purpose of his bill of exception the grand jury testimony. While the appellant has attempted to point out inconsistencies between the grand jury testimony and some witnesses' testimony, we cannot agree that the inconsistencies, if any, were such as to reflect error in the trial court's action in refusing to make the grand jury testimony available for cross-examination. We fail to see how appellant was harmed.

■ Appellant further advances the contention that the court erred in admitting evidence illegally obtained from the Brown residence and from an automobile without a search warrant and in violation of his Fourth and Fourteenth Amendment rights under the federal constitution. See also Article I, Sec. 9, Texas Constitution, Vernon's Ann.St.; Articles 1.06 and 38.23, V.A.C.C.P. We do not agree.

In this ground of error the appellant complains of the admission into evidence of the brown shirt found in the Brown home about 10:30 a. m. on April 18, testimony concerning pieces of the hall and bedroom carpet taken from the house about 1 p. m., and testimony concerning the wet spot on a mat in the trunk of an automobile observed about 4 or 5 p. m., and the introduction of the mat.

**2.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

The officers responded to a call from the appellant's uncle in the early morning hours of April 18. They were admitted to the Brown home by the appellant and ascertained that homicides had been committed. Under these circumstances, it became the officers' duty to conduct a thorough investigation into the circumstances. Certainly this duty carried with it the right to inspect the premises. See United States v. Barone, 2nd Cir., 330 F.2d 543; Stevens v. State, Alaska, 443 P.2d 600; Patrick v. State, Del., 227 A.2d 486; Parsons v. State, 160 Tex.Cr.R. 387, 271 S.W.2d 643, cert. den., 348 U.S. 837, 75 S.Ct. 36, 99 L. Ed. 660.

It appears that after the arrival of Deputies Woodard and Knox the Justice of the Peace and other officers were alerted. The first two officers subsequently left the scene to continue another phase of the investigation. The appellant left the premises between 5:30 and 6 a. m. Whether he departed prior to the arrival of Justice of the Peace Land, who acted as coroner, is not exactly clear from the record. After the bodies were removed Judge Land departed around 8 a. m. and continued his investigation later at the funeral home. Deputies Rice and Jackson arrived about 8:30 a. m., found the house locked and sought the aid of a relative. Being unable to open the door with the key obtained, Rice crawled through a window. At approximately 10 a. m. Woodard and Knox returned and it was Knox who at this time found the shirt in question.

After the house had been closed a second time, Rice, Jackson and a district attorney's investigator returned to the scene and with a key which had been obtained again entered the house. At this time they removed a 20″ x 36″ piece of hall carpet and a 5″ x 10″ piece of bedroom carpet, both of which were apparently blood soaked.

Between 4 and 5 p. m. on the same date, about the same time appellant was being arrested, Deputies Woodard and Knox, Ranger Wilson and the uncle, Clyde Fowler, who furnished the key to the trunk of the car, returned and removed a circular piece of matting from the auto trunk of the 1964 white Ford, leased to the Insurance Agency and owned by the victims, which was parked at the Brown home.

In Parsons v. State, 160 Tex.Cr.R. 387, 271 S.W.2d 643 (1954), cert. den., 348 U.S. 837, 75 S.Ct. 36, 99 L.Ed. 660, notes taken from a waste basket and letters from a desk in the apartment of the appellant and her husband, the deceased, by officers before the body was removed while the Justice of the Peace was conducting an inquest, were held admissible.

There it was held that the coroner had the duty to obtain information as to whether the death was caused by some criminal act, to obtain evidence to prevent the escape of the guilty party, and to furnish information for prosecution in the event death was shown to be felonious, and that it was the duty of the officers lawfully present in the discharge of their duties to conduct the search at the homicide scene and preserve evidence found which might show that the death was the result of a crime and such search was not unreasonable or unlawful.

There can be no question that if the discovery of the shirt and the removal of the carpet and the auto trunk matting had occurred while the coroner was still present and before the bodies were taken to the funeral home, Parsons would be clearly controlling.

Do the circumstances of the instant case as to search all occurring within 12 hours or so of the original information received by the sheriff's office call for a different result? We think not.

"The general rules governing searches and seizures are subject to the exception of emergency situations, sometimes called the 'exigency rule.' The reasonableness of any entry by the police upon private property is measured by the cir-

cumstances then existing. The right of police to enter and investigate in an emergency, without an accompanying intent either to seize or arrest, is inherent in the very nature of their duties as peace officers, and derives from the common law. United States v. Barone (CA 2) 330 F.2d 543 (1964). * * * As a general rule, we think, an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact. Wayne v. United States, 115 U.S.App. D.C. 234, 318 F.2d 205 (1963); Davis v. State, 236 Md. 389, 204 A.2d 76 (1964); compare Miller v. United States, 357 U. S. 301, 78 S.Ct. 1190, 1200, 2 L.Ed.2d 1332 (1958)." Patrick v. State, 227 A.2d 486, 489 (the Delaware Supreme Court speaking through Justice Herrmann).

In Stevens v. State, supra, the Alaska Supreme Court was confronted with the principal question of whether a delay of approximately ten hours in conducting a homicide investigation on the premises legally entered by the police in response to an emergency call is fatal to the constitutionality of the investigation and to the admissibility of the evidence obtained.

There the court held the delay between legal entry by an officer of a remote island village who learned of the homicide, made superficial inspection, locked the house and called the state police and the subsequent entry by state police who took evidence in plain view, took photographs and drew diagrams did not render the investigation in violation of the constitutional right of privacy or violate the Fourth Amendment of the United States Constitution.

The acts complained of in the instant case took place within a 12 hour period of time after the original legal entry by the officers and during an investigation into unsolved homicides occurring in a rural home approximately 14 or 15 miles from the sheriff's office from which the officers were operating. Given all of the circumstances of the case at bar, we cannot conclude there was a violation of appellant's constitutional rights as claimed. Stevens v. State, supra; State v. Sutton, supra.

█ It is also urged that the trial court erred in admitting "communicative and physical evidence of an inculpatory nature" which was illegally obtained from the appellant during a custodial interrogation in violation of the Fifth, Sixth and Fourteenth Amendments, United States Constitution.

Although the appellant did not pinpoint just what evidence he has reference to, it appears to concern testimony relating to appellant's interview by the District Attorney at his office when it was admitted that no warnings had been given to the appellant.

Several hours after appellant's uncle had called law enforcement officers and the appellant had admitted them into the house where the bodies of the deceaseds had been found, the appellant was asked to come to the District Attorney's office. It appears that at this point the District Attorney had commenced to check appellant's claim that he had been in a poker game by talking to one of the participants. The shirt with what appeared to have blood on it had been discovered, but the ownership of the shirt was not then known nor had there been any tests to determine if the spots were human blood and if so, whether the blood type was the same as that of either victim. The appellant acknowledged the shirt was his and that he had worn it the day before but disclaimed any knowledge as to how the spots had gotten on the shirt. He also stated the pants he then had on were the ones he had on "all day yesterday." At the time of the interview the bundle of clothes in the park had not been

discovered, nor had Anita Roberson informed the officers as to the type of trousers the appellant was wearing when he had picked her up on April 17, 1967.

The record reflects the District Attorney and the officers were making a general investigation into an unsolved crime and were checking on all sources of information about the deaths involved. It was only natural that the District Attorney would want to talk to the man who had discovered the bodies. The appellant was informed at the time of the interview he was not under arrest and that the investigations into the deaths had to start somewhere. The appellant, accompanied by his uncle, had gone voluntarily to the prosecutor's office and left with his uncle when the interview was concluded.

It was only after additional information came to the attention of the law enforcement officers that the investigation began to focus on the appellant, leading to the filing of a complaint later on the afternoon of April 18, 1967.

The courts have regarded interrogations in prosecutors' offices with a fair degree of willingness to find them non-custodial. State v. Seefeldt, 51 N.J. 472, 242 A.2d 322 (1968); Commonwealth v. Feldman, 432 Pa. 428, 248 A.2d 1 (1968). See also United States v. Jackson, 390 F.2d 317 (2nd Cir., 1968); People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967). See also Commonwealth v. O'Toole, 351 Mass. 627, 223 N.E.2d 87 (1967), aff'd. on habeas corpus sub nom; O'Toole v. Scafati, 386 F.2d 168 (1st Cir., 1968), cert. den., 390 U.S. 985, 88 S.Ct. 1109, 19 L.Ed.2d 1285. We think this especially true where the individual involved is accompanied to the interview by friends or relatives, told he is not under arrest (Archer v. United States, 393 F.2d 124, 5th Cir., 1968); Robinson v. State, Tex.Cr.App., 441 S.W.2d 855 (1969), and is allowed to go free after the interview. See Evans v. United States, 377 F.2d 535 (5th Cir., 1967); Nobles v.

United States, 391 F.2d 602 (5th Cir., 1968); Jones v. State, Tex.Cr.App., 442 S. W.2d 698. The fact that an individual was arrested several hours after the interview, particularly after additional information has come to the authorities, would not transform the interview into one classified as custodial.

Thus it is clear that the appellant was not under arrest, "in custody" or "otherwise deprived of his freedom of action in any significant way" at the time of his oral statements or otherwise subjected to a custodial interrogation. We cannot agree that testimony relating to such interview was barred by Miranda v. Arizona, 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, as claimed by the appellant. See Jones v. State, Tex.Cr.App., 442 S.W.2d 698, 703, and cases there cited. Further, we fail to perceive a violation of Article 38.22, V.A. C.C.P.

■ For the same reason we cannot agree that the court erred in "failing to require the jury to make findings of facts regarding" the interrogation and in failing to instruct the jury to disregard the evidence concerning the interrogation if such was obtained contrary to law. We further note that even if the voluntariness of a statement or confession is submitted to a jury our practice does not require a special issue submission. See Harris v. State, Tex.Cr.App., 457 S.W.2d 903.

■ We also fail to find merit in appellant's claim that the court erred in refusing to allow him to withdraw his announcement of ready when the court "reversed his own pre-trial order about the admissibility of certain communicative and physical evidence illegally obtained from the appellant." Here again, the ground of error relates to the appellant's interview by the District Attorney.

Prior to the change of venue the Lubbock County District Judge granted appellant's "Second Motion in Limine" which

requested the suppression of any inculpatory statements of the appellant made during the interview with the District Attorney. After change of venue the El Paso County District Judge reaffirmed all pretrial orders entered in Lubbock County. Thereafter, upon the request of the prosecutor the court reconsidered the question of the admissibility of testimony and permitted the same to be offered. Since the testimony was admissible, we find no error in the court's action in changing its mind.

Next the appellant contends the court erred in permitting the State to improperly impeach its own witness, Dr. John Ray, Jr., and cause such witness to change his prior testimony regarding the time of death of the deceaseds so as to coincide with the State's theory of the case.

Dr. Ray, a pathologist, testified he had performed autopsies on the deceaseds on April 18, 1967, and immediately dictated a report stating his opinion that the time of the deaths was between midnight and 2 a. m. on that date. Five days later, after further lab tests, he dictated his final summary estimating the time of the deaths was "around 2:00 a. m., 4–18–67," but since the bodies had been embalmed prior to the autopsies he extended the time of the deaths "to possible limits on either side of circa midnight to as late as 4:00 a. m., 4–18–67."

When asked on direct examination if his testimony would be the same as the autopsy reports the witness stated he "would like to change it a little—significantly" and further, "This is really—I really don't known what time they were—they died. This is because primarily we were not—we did not do the autopsy until after the body had been embalmed, and this removes a good many of the findings on which we judge the time of death. Number 2, it's very difficult to pinpoint a time of death under the present circumstance, and finally, I have no real way of knowing for sure how long these injuries were incurred until death ensued. . . . I believe these

hours of twelve to four are little too tight; I cannot be certain. This was my original impression written down, but I just can't say one hundred per cent sure that this is when they died."

On cross-examination Dr. Ray testified he changed his opinion after "subsequent thought" and "reconsideration." The District Attorney testified he was informed by the witness of a change in his opinion between April and September, 1967, prior to the change of venue and that he informed one of the defense counsel of his conversation with the doctor.

We cannot agree that impeachment was here involved. To impeach a witness means adducing proof that such witness is unworthy of belief or credit. White v. New York, C. & St. L. Railroad Co., 142 Ind. 648, 42 N.E. 456; Johnston v. Belk-McKnight Co. of Newberry, 188 S.C. 149, 198 S.E. 395, 399. The State was not calling into question the veracity of the witness, but permitting an expert witness to explain that he had changed his prior opinion and why. The fact that the witness changed his opinion would not render his testimony inadmissible, but only affect weight to be given his testimony and his credibility as a witness. Wesley v. State, Tex.Cr.App., 388 S.W.2d 431.

Still further, the appellant claims the court erred in refusing to permit him to take the witness Earl Woodard on voir dire out of the jury's presence as a predicate for and in support of his objection to the validity of the search of the house where the bodies were found.

The manner of examining a witness is a matter generally resting within the sound discretion of the trial court. See Suiter v. State, 165 Tex.Cr.R. 578, 310 S.W.2d 81. While it would appear at first blush that the court should have heeded the request made, it is observed that the witness had previously testified at the examining trial and at a pretrial motion to suppress con-

cerning his visits to the house of the deceaseds. Such records had been transcribed and were before the trial court at the time of the ruling in question. Further, after the ruling the appellant never perfected his bill of exception by showing what the witness would have testified if he had been taken on voir dire, nor was an offer of proof made. See Article 40.09, Sec. 6(d) (1), V.A.C.C.P.

 Appellant also contends the court erred in permitting a witness for the prosecution, Anita Roberson, to testify concerning her conversation with the District Attorney when he (the appellant) was not present in violation of the hearsay rule. This complaint appears to arise out of a cart before the horse situation or the elicitation of bolstering testimony prior to proof of testimony sought to be bolstered.

It was undisputed that Anita Roberson was with the appellant from mid-afternoon on April 17 until approximately 3:15 a. m. on April 18. When she was called the State immediately elicited from her that she had gone to the sheriff's office on the afternoon of April 18 and had been shown by the District Attorney a shirt and asked to identify it. It was at this point the alleged hearsay was permitted over objection.

"Q. What question was asked you about this shirt, Anita?

 \* \* \* \* \* \*

"A. You asked me if—if it was the shirt Jack had on, if I had seen it. I don't remember exactly.

 \* \* \* \* \* \*

"Q. And what did you say; what did you do at that time?

"A. I told you that it looked like the one.

"Q. Looked like the one what, Anita?

"A. That he had on.

"Q. When?

"A. Earlier that day."

At this juncture the defense objection was sustained. Thereafter, without objection, the witness identified the shirt shown her as the one that "looks like the one" she had seen in the sheriff's office and the one the appellant had on when he picked her up on April 17. She also identified a pair of brown checked pants as the ones the appellant wore at the same time. It is obvious the witness was primarily called to identify the clothing the appellant wore on April 17.

While the hearsay testimony should not have been permitted over objection, we consider the error harmless in light of the admissible testimony of the witness and the statement attributed to the appellant that the shirt in question was the one he wore on the afternoon of April 17.

 Appellant contends the court erred in permitting Carol Cochran to testify concerning "a two year old debt owed the witness by the appellant as such was irrelevant to any issue in the case." He also maintains testimony concerning the witness' conversations with the deceased Birdie Brown was a violation of the hearsay rule.

The ground of error appears to be multifarious and reflects a failure to comply with Article 40.09, Sec. 9, V.A.C.C.P.

 Nevertheless, we observe that the Cochran testimony was apparently offered to place the appellant's financial condition at the time of the alleged offense (which was an issue in the case) in proper perspective. Although the $200 loan was made two years before, repeated efforts by the witness to secure repayment right up to the date in question were unsuccessful. We conclude this testimony was relevant, bearing in mind the evidence that the appellant was apparently short of money when he registered at the motel, the money

was apparently taken from the body of the appellant's father, and the amount of money appellant had at the time he entered the poker game.

The witness Cochran related that during her efforts to contact the appellant she had talked on the telephone with his mother on April 4, 1967, and again on April 17, 1967. The nature of the conversations was not inquired into, the witness merely testifying to the fact of the telephone conversations. We perceive no violation of the hearsay rule. Cf. Stickney v. State, 169 Tex.Cr.R. 533, 336 S.W.2d 133.

Appellant also urges that the trial court erred in admitting and then displaying items of bloody clothing along the jury rail in close proximity to the jury. The items complained of consisted of a shirt and pants belonging to the appellant, his mother's dress, his father's coveralls, and a towel bearing the first letter of appellant's last name and the last four digits of his Army serial number.

The general rule governing the admissibility of bloody clothing as set forth in 4 Branch's Ann.P.C., 2d ed., Sec. 2029, p. 340, states:

"It is permissible to introduce bloody clothing in evidence only when the introduction serves to illustrate some point or solve some question, or serves to throw light upon the matter connected with the proper solution of the case, and under no other circumstances; but whenever the introduction of such clothing would, in the light of the whole case, aid the jury in arriving at the very truth of the matter, the court should not hesitate to admit its production and exhibition."

While the general rule is in favor of exclusion, the exception which allows the introduction of bloody clothing may be based upon any ground of relevancy. Hunter v. State, 161 Tex.Cr.R. 225, 275 S.W.2d 803. Much discretion must necessarily rest in the trial judge. Cf. Burns v. Beto, 5th Cir., 371 F.2d 598.

"When the evidence is wholly circumstantial every fact and circumstance reasonably calculated to illuminate the transaction should be permitted to go to and be weighed by the jury." 4 Branch's Ann.P. C., 2d ed., Sec. 2048, p. 357.

The instant case was a circumstantial evidence case where the defense was alibi and the various items played a vital role in the case. The pants, shown to belong to the appellant, had blood spots of the same blood type as that of appellant's mother, one of the deceaseds. Other clothing or items were identified as belonging to the deceaseds and having been worn the day of their death or having come from their home. We perceive no error in the admission of these items or their exhibition to the jury after introduction. The State went to great lengths to prevent the items from being viewed by the jury until they were properly admitted into evidence. It should also be remembered that the blood on such items would have been there approximately a year and a half before being displayed to the jury.

We, likewise, overrule appellant's contention that the proper predicate or chain of custody was not established prior to the introduction of the pants in question. While perhaps not laid in a model fashion, we deem the predicate sufficient.

Appellant also advances the claim that the court misdirected the jury "in that the definition of murder with malice failed to require the jury to find that malice aforethought should and must exist at the time of and during the commission of the offense of murder before" he could be convicted of murder with malice. Appellant's written objection was actually addressed to paragraph III of the charge which defined "malice aforethought." The court's definition of malice aforethought is in substantial compliance with that suggested by Willson's Criminal Forms, 7th Ed., Secs. 3534, 3535, 3538. Further, we know of no requirement that when the court defines terms in its charge it must also in the same

paragraph include requirements as to the jury's findings. When viewed as a whole the charge properly instructed the jury on the indictment's allegations. We fail to find any error in the charge calling for reversal. See Article 36.19, V.A.C.C.P.

■ Appellant also urges that the court erred in failing to charge on murder without malice.

The appellant did not testify and a search of the evidence fails to reveal support for the submission of such a charge. There being no evidence that the appellant acted under the immediate influence of sudden passion arising from an adequate cause, he was not entitled to the charge requested. Ortegon v. State, Tex.Cr.App., 459 S.W.2d 646; 29 Tex.Jur.2d, Homicide, Sec. 279, p. 514. A trial court is under a duty to submit a charge concerning the law of murder without malice only when the facts present the issue. See Article 1257c, Vernon's Ann.P.C.; Rayson v. State, 160 Tex.Cr.R. 103, 267 S.W.2d 153; Bridges v. State, 128 Tex.Cr.R. 544, 83 S.W.2d 671; Franks v. State, 130 Tex.Cr.R. 577, 95 S. W.2d 128; Tebo v. State, 133 Tex.Cr.R. 61, 106 S.W.2d 712.

It has also been held that in cases of a malicious killing, in which the defense of alibi is interposed, a charge on murder without malice is neither proper nor required. See Johnson v. State, 169 Tex.Cr. R. 612, 336 S.W.2d 175, cert. den., 364 U.S. 927, 81 S.Ct. 355, 5 L.Ed.2d 267; Cassell v. State, 154 Tex.Cr.R. 648, 216 S.W.2d 813, reversed on other grounds, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Rayson v. State, supra. The defense in the instant case was alibi.

We fail to see error in the court's action in refusing to charge on the issue of murder without malice.

■ Next appellant complains of the court's refusal to charge the jury that the State was bound by his exculpatory state-ments introduced by the State unless the same is shown by other evidence to be untrue, and that unless the State discharged its burden of showing such statements to be false by other evidence beyond a reasonable doubt the jury should acquit.

The statements referred to were those made by the appellant in his interview with the District Attorney that he came home shortly after 5 p. m. on the date in question and changed clothes and when he left his father was "still in the fields" wearing coveralls, and that he did not know how blood had gotten on his shirt when it was shown to him.

Exculpatory is often defined as clearing or tending to clear from alleged fault or guilt. Moore v. State, 124 Tex.Cr.R. 97, 60 S.W.2d 453; Steen v. State, 158 Tex. Cr.R. 77, 253 S.W.2d 279; Baird v. State, 156 Tex.Cr.R. 644, 246 S.W.2d 192. Even if the statements were true, it is difficult to see how statements would clear or tend to clear the appellant and entitle him to an acquittal.

We do not view either of these statements, introduced by the State, as being exculpatory so as to require the charge requested. See McClelland v. State, Tex.Cr. App., 389 S.W.2d 678. As in Gibson v. State, 53 Tex.Cr.R. 349, 110 S.W. 41, 48, there is no admission or statement admitting the killings but seeking to justify and excuse the same. The statements were offered by the State "as tending to show the account given by appellant was untrue, known by him to be untrue, and therefore incriminating evidence against him, in that they show an effort and scheme to shield himself from the force and effect of his presence at the scene of the homicide and other facts tending to connect him with the murder." See also Asner v. State, 138 Tex.Cr.R. 420, 136 S.W.2d 822, 826; Grady v. State, Tex.Cr.App., 466 S.W.2d 770.

■ Appellant further claims the court erred in instructing the jury the

State was not bound by the date alleged in the indictment. He contends the instruction was calculated to destroy his defense of alibi, was a comment on the weight of the evidence and charged an abstract proposition of law without applying the law to the facts.

The instant indictment was returned on May 3, 1967, and alleged the offense charged was committed "on or about the 18th day of April, 1967."

Article 21.02, Sec. 6 (former Art. 396, Sec. 6), V.A.C.C.P., provides the time mentioned in the indictment must be some date anterior to the presentment of the indictment, and not so remote that the prosecution of the offense is barred by limitation.

It is thus well settled that the State is not bound by the date on or about which the offense is alleged to have been committed, but a conviction may be had upon proof that the offense was committed any time prior to the return of the indictment, that is, within the period of limitation. Rogers v. State, 169 Tex.Cr.R. 239, 333 S. W.2d 383; Ellis v. State, 167 Tex.Cr.R. 87, 318 S.W.2d 655; Hunter v. State, 95 Tex. Cr.R. 394, 254 S.W. 993; 1 Branch's Ann. P.C., 2d ed., Sec. 459, p. 457.

In Mikulec v. State, 97 Tex.Cr.R. 615, 262 S.W. 751, it was noted that "[i]t is customary in this state to instruct the jury that the state is not restricted to the exact date laid in the indictment. * * *"

In Nees v. State, Tex.Cr.App., 402 S.W. 2d 186, the defendant insisted the court erred in charging the jury to find him guilty if they found beyond a reasonable doubt that he fraudulently converted any sum of money to his own use between November 28, 1958, and November 27, 1961, where the indictment, returned on November 28, 1961, alleged the offense was committed on or about the 31st day of July, 1959. The court overruled the Nees' contention that such instruction amounted to a denial of due process. See also Nees v. Culbertson, 5th Cir., 406 F.2d 621.

In light of the evidence as to whether the fatal injuries were inflicted on April 17 or on April 18, 1967, as alleged, the charge appears proper, not subject to the objections advanced by the appellant.

■ The appellant presented his sworn motion for probation following the verdict of guilty and before the penalty stage of the bifurcated trial commenced. He complains of the court's action in refusing to permit the jury to consider such motion, although the statute requires such motion to be "filed before the trial begins." Article 42.12, Sec. 3a, V.A.C.C.P. The appellant had prior to trial elected to have the jury assess the punishment in the event of a finding of guilt (see Article 37.07, V.A. C.C.P.), but he did not file his motion requesting jury consideration of probation until after the guilty verdict at the first stage of the trial.

The requirement that the motion be "filed before the trial begins" if the jury is to consider probation obviously was taken from the former Suspended Sentence Law (Articles 776–781a, V.A.C.C.P., 1925) when the unitary trial prevailed. See Special Commentary, Article 42.12, supra; Glass v. State, Tex.Cr.App., 450 S.W.2d 320.

The phrase "before the trial begins" found in the former Article 776 was interpreted to mean before "the announcement of ready for trial by both parties." Wilson v. State, 85 Tex.Cr.R. 148, 210 S.W. 802. This provision was not construed as being mandatory and the court was permitted in its discretion to permit the filing of such suspended sentence application or motion at any time before jury argument at the unitary trial. Diaz v. State, 159 Tex.Cr.R. 545, 266 S.W.2d 136. The late filing was to be allowed where extraordinary conditions and the ends of justice required the same. Trevinio v. State, 93 Tex.Cr.R. 439, 247 S.W. 872.

In Cortez v. State, 144 Tex.Cr.R. 116, 161 S.W.2d 495, there was no error when

the trial court refused to permit an application for suspended sentence to be filed after six jurors had been selected.

While it is true that under the 1965 Code of Criminal Procedure proof in connection with a motion for probation is not to be presented until the penalty stage of the proceedings, Stephens v. State, Tex.Cr. App., 417 S.W.2d 286, 288 (1967); Smith v. State, Tex.Cr.App., 414 S.W.2d 659, the belated motion in the instant case deprived the State of the opportunity of making inquiry of prospective jurors on voir dire examination as to the probation law.

Nevertheless, appellant complains that it is impossible for a juror not to attach some incriminating significance to the filing of a motion for probation when at the same time he is entering a "not guilty" plea, and notes this injustice also existed under former Suspended Sentence Law despite the usual court instruction to the jurors that the filing of such a motion was no evidence of the defendant's guilt. He urges that probation is a subject to be considered only after guilt is established, and that by being required to file a probationary motion before trial he was denied a fair and impartial trial and deprived of due process in violation of the Sixth and Fourteenth Amendments, United States Constitution.

He does not explain however just when, under our bifurcated trial system, either party would have an opportunity to "voir dire" the jury as to the probation law if the motion for probation is not to be filed until the guilty verdict is received.

The problems he advances may well merit legislative consideration of procedural amendments, but under our present system they are far more of a legislative nature than ones that present themselves as clearly solvable by judicial processes.

Under the circumstances presented in the instant case, we cannot conclude the trial court abused its discretion even though the appellant made proof in the jury's absence that he had never been previously convicted of a felony. Nor do we conclude there has been a showing that any constitutional right has been violated. Glass v. State, supra.

We further note that the penalty assessed, 13 years, would have prevented the consideration of probation by the jury, or even subsequently by the court. See Article 42.12, V.A.C.C.P.

■ We find no merit in appellant's claim that the court erred in refusing to require the State, during its opening jury argument at the guilt stage of the trial, to fully open and disclose its theory of the case and to fully discuss the evidence deemed by the prosecution to be relevant thereto.

At the conclusion of the opening argument in which the charge and most of the evidence was discussed, the appellant made his motion that the State continue such argument disclosing its theory of the case. The motion was refused. At the conclusion of the State's closing argument which followed three arguments by the defense, the appellant then requested further argument in order to rebut the State's theory as to the time of the deaths first advanced in the concluding argument. In argument appellant's counsel had called upon the State to suggest when the killings took place. The motion was overruled.

■ The order of argument is left to the discretion of the trial judge under Article 36.07, V.A.C.C.P., and we decline to apply Rule 269, Texas Rules of Civil Procedure, to jury argument in criminal cases.

■ Appellant raises three grounds of error concerning alleged jury misconduct.

He claims "the jury committed misconduct prior to deliberating on the issue of guilt or innocence by receiving new unsworn testimony from the bailiff."

At the hearing on the motion for new trial the foreman, M. Q. Callaghan, testified that a fellow juror (whom he thought to be Cruz Rincon) told him the bailiff, Jim Apodaca, had said to such juror that "the boy was guilty as hell but the State's evidence was not sufficient to prove him guilty."

When juror Rincon was called to testify he was not questioned about the alleged statement. Juror Salazar related he heard the statement made in the jury room but it was not the bailiff who made the statement. Juror Curtis heard such a statement attributed to Bailiff Apodaca, but he did not recall who said Apodaca had made such a statement. The testimony of the other jurors was similar, but none stated they heard Apodaca make the statement in question.

Jim Apodaca testified he had been a bailiff for 15 years and that he had not given any thought as to whether the State had proved its case. He denied unequivocally that he made the statement attributed to him.

The instant case is distinguishable from Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). There the offending bailiff's statements to a juror were overheard by another regular juror and an alternate. Here no juror testified he heard the statement made by the bailiff and the bailiff denied the statement was ever made. All the evidence to the contrary was clearly hearsay and insufficient to raise the issue. Therefore we do not reach the question of whether appellant's Sixth Amendment rights were violated.

Further, if such an issue was raised at the hearing on the motion for new trial, the trial judge was the trier of the facts and it is apparent from his ruling he accepted the testimony of the bailiff which was the only competent evidence presented. We find no abuse of discretion. See Walton v. State, Tex.Cr.App., 398 S.W.2d 555; Loshe v. State, 160 Tex.Cr.R. 561, 272 S.

W.2d 517; Freeman v. State, 95 Tex.Cr.R. 515, 254 S.W. 791.

■ Appellant also complains that jury misconduct occurred when the jury, while deliberating on the issue of guilt, discussed and used his failure to testify as a circumstance against him, despite the court's charge not to do so.

Nine jurors testified concerning such claim. Two jurors related no mention of the appellant's failure to testify was made during their deliberations. Three jurors testified such a statement was made but it was followed by an admonishment that such subject could not be considered or discussed. Two other jurors testified that such a statement was made briefly. They were not asked whether an admonishment followed. The remaining two jurors did testify there was a discussion of the failure of the appellant to testify.

"The trial court is clothed with discretion in determining whether a new trial shall be granted on the ground that the jurors discussed the failure of the accused to testify in his own behalf, and an order denying the motion ordinarily will not be disturbed if the court has determined, on conflicting evidence, that the alleged misconduct did not in fact occur, or that the statement was made casually or incidentally." 41 Tex.Jur.2d, New Trial, Sec. 44, p. 136.

Under the circumstances presented, we cannot say the court abused its discretion in refusing to grant a new trial. Garza v. State, Tex.Cr.App., 368 S.W.2d 213. See also Manning v. State, Tex.Cr.App., 393 S.W.2d 910.

■ Appellant also contends jury misconduct resulted when the jurors agreed to be bound by a quotient verdict during their deliberations at the penalty stage of the trial.

Nine jurors testified that one of the jurors took down the number of years each

juror favored assessing, added the total and divided that number by twelve. This appears to have been done several times during the deliberation on punishment. The last of these calculations resulted in thirteen and a fraction years. After such calculation the jury again took a ballot and all jurors voted for the penalty of thirteen years. All of the jurors testified they were not bound to accept the average reached by such procedure. It would appear that the conduct of the jury amounted to an experiment with no agreement to be bound by the result, using the average only as a working basis. No error is reflected. See Davis v. State, Tex.Cr.App., 419 S.W. 2d 648, 650; Collins v. State, 118 Tex.Cr. R. 550, 39 S.W.2d 899; 41 Tex.Jur.2d, New Trial, Sec. 79, p. 204.

We have examined appellant's other grounds of error and find them to be without merit.

Finding no reversible error, the judgment is affirmed.